RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0131p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant* (15-1299),

        *Plaintiff-Appellee* (15-1560),

        Nos. 15-1299/1560

    *v.*

KELVIN ALEXANDER CRUMPTON,

        *Defendant-Appellee* (15-1299),

        *Defendant-Appellant* (15-1560).

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cr-20842—Arthur J. Tarnow, District Judge.

Argued: March 11, 2016

Decided and Filed: June 2, 2016

Before: DAUGHTREY, MOORE, and SUTTON, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Shane N. Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant in 15-1299 and for Appellee in 15-1560. Martin J. Beres, Clinton Township, Michigan, for Appellee in 15-1299 and for Appellant in 15-1560. **ON BRIEF:** Shane N. Cralle, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellant in 15-1299 and for Appellee in 15-1560. Martin J. Beres, Clinton Township, Michigan, for Appellee in 15-1299 and for Appellant in 15-1560.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. A two-count indictment charged Kelvin Crumpton with being a felon in possession of ammunition and with possessing various narcotics with the intent to distribute them. The evidence against him came largely from two sources: An October 18, 2013 search of his residence, which uncovered ammunition and narcotics, and two statements made by Crumpton to law enforcement while being interrogated during that search. Crumpton twice moved pretrial to suppress the evidence recovered from the search, but the district court denied both motions. At the close of the government's case, Crumpton argued for the first time that the first of his statements to law enforcement was made after inadequate *Miranda* warnings. The district court agreed, suppressed that statement, and instructed the jury not to consider it. After Crumpton was convicted by the jury on both counts, he moved for a partial judgment of acquittal, arguing that the evidence was insufficient to support his conviction for possession of ammunition. In the alternative, Crumpton sought a new trial under the theory that the jury had been prejudiced by hearing his first statement to law enforcement. The district court granted this motion, ruling sua sponte that Crumpton's second statement to law enforcement must be suppressed and that this suppression rendered the evidence insufficient to support the jury's verdict regarding the possession-of-ammunition charge. In the alternative, the district court granted Crumpton a new trial out of concern that the jury was prejudiced by hearing Crumpton's first statement to law enforcement. The government appeals the grant of Crumpton's motion for judgment of acquittal and for a new trial, and Crumpton appeals his narcotics conviction. For the reasons that follow, we **REVERSE** the district court's grant of Crumpton's motion for judgment of acquittal or a new trial regarding the ammunition charge and **REINSTATE** the jury's guilty verdict, **AFFIRM** Crumpton's narcotics conviction, and **REMAND** for resentencing.

## I. BACKGROUND

**A.  Factual Background**

735 Sloan Street is a single-story house located on the east side of Sloan Street in Detroit, and it is the only house on that side of an otherwise vacant, overgrown block.  *See* R. 54 (Trial Tr. Vol. 1 at 44:1–5) (Page ID #794).  From the outside, it appears to be a single-family home, R. 53 (Trial Tr. Vol. 2 at 64:24–65:6) (Page ID #667–68), but there are multiple mailboxes in front of the house, *id.* at 57:19–58:1 (Page ID #660–61).

In 2013, Officer Donald Farris of the Wayne County Sheriff's Office "had a confidential source . . . that was providing information on [735 Sloan Street]."  R. 54 (Trial Tr. Vol. 1 at 44:12–13) (Page ID #794).  That informant indicated to Officer Farris "that a black/male residing in this dwelling was selling crack-cocaine and heroin from this residence."  R. 15-1 (Search Warrant ¶ 3) (Page ID #102).  Officer Farris investigated and "identified some individuals that were associated with that residence," including Crumpton.  *See* R. 54 (Trial Tr. Vol. 1 at 44:16–17) (Page ID #794); R. 15-1 (Search Warrant ¶ 3) (Page ID #102).  Officer Farris then presented a photograph of Crumpton to the confidential informant, who "immediately identified the photograph as the main narcotics seller at the Sloan St residence."  R. 15-1 (Search Warrant ¶ 4) (Page ID #102).  The informant also indicated that Crumpton "sells narcotics on a regular basis and accepts money, firearms, vehicles, and other stolen property as payment" and that he "maintains firearms at the residence, likely to protect his drug trade."  *Id.* ¶ 5 (Page ID #102).  Farris next utilized that confidential informant to conduct a purchase of crack cocaine from the home.  *See* R. 54 (Trial Tr. Vol. 1 at 45:2–10) (Page ID #795); R. 53 (Trial Tr. Vol. 2 at 37:24–40:18, 61:4–62:2) (Page ID #640–43, 664–65); R. 15-1 (Search Warrant ¶ 4) (Page ID #102).  Based upon this information, Officer Farris obtained a search warrant for the Sloan Street Residence.

The search warrant was executed on October 18, 2013.  During the search, agents found that the house was divided between front and back, but "[t]here was an access way that would allow someone to move about the house from the front to the back"—"[i]t was a small kind of hole in the wall."  R. 53 (Trial Tr. Vol. 2 at 9:19–23) (Page ID #612).  There were also entrances

to the house in both the front and back. *See id.* at 9:12–18 (Page ID #612). The back of the house had two rooms, one of which was set up as a bedroom while the other was "more like a closet with just a bunch of clothes and stuff scattered." *Id.* at 10:23–11:5 (Page ID #613–14). The front of the house had a cluttered room with a number of items that Officer Farris suspected were stolen property, and also a "room kind of like a bedroom off of this front room that had almost a studio setup, a laptop and speakers and DJ type equipment." *Id.* at 12:19–25 (Page ID #615). Although a number of the rooms in the house could have been used as bedrooms, only one bed was found in the house (in the back bedroom), *id.* at 64:5–11 (Page ID #667), and a single mattress was found in the front of the house, *id.* at 65:12–20 (Page ID #668).

The search revealed twenty-three rounds of ammunition of various types, found in a front room, *id.* at 12:5–13:6 (Page ID #615–16), as well as crack cocaine, powder cocaine, marijuana, and heroin in both the front and rear areas of the house, including in the bedroom in which Crumpton was found, *id.* at 10:15–24, 13:18–25:24 (Page ID #613, 616–28). Finally, law enforcement recovered from the rear of the house various "residency documents"—including one such document linking the Sloan Street address to Crumpton's name. *See id.* at 28:16–31:4 (Page ID #631–34). Law enforcement also located six people, in addition to Crumpton, including four who indicated that they lived at the Sloan Street Residence or were "staying there." *See id.* at 6:14–10:2 (Page ID #609–12). Everyone was taken outside of the house while the search occurred. *See id.* at 103:13–22 (Page ID #706).

At this point, Crumpton was interrogated by ATF Agent Gregory Lotoczky, who read Crumpton his *Miranda* rights. *See id.* at 104:1–5 (Page ID #707). This encounter was recorded ("the First Warnings"), and included Agent Lotoczky reciting and Crumpton confirming his understanding of the following: (1) "the right to remain silent"; (2) that "[a]nything you say can be used against you in court"; (3) "the right to consult with an attorney and have them present during questioning" and (4) that "[i]f you cannot afford an attorney, one will be appointed to represent you prior to questioning." R. 68-3 (Tr. of Audio Recording at 2) (Page ID #967). After briefly entering the house, Lotoczky returned and spoke with Crumpton. *See* R. 53 (Trial Tr. Vol. 2 at 105:8–25) (Page ID #708). An audio recording of that conversation reflects that

Crumpton admitted that "there might be some old bullets laying around" the house ("the First Statement"). R. 68-1 (Tr. of Audio Recording at 4) (Page ID #937).

Agent Lotoczky subsequently had another interaction with Crumpton, which took place in the Sloan Street Residence's front room. *See* R. 53 (Trial Tr. Vol. 2 at 108:11–16) (Page ID #711). Lotoczky read Crumpton his *Miranda* rights ("the Second Warnings")—this time adding a fifth warning that "if you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time." R. 68-2 (Tr. of Audio Recording at 2–4) (Page ID #940–42). Agent Lotoczky then discussed Crumpton's ability to waive his rights, at which point Crumpton asked to "see the search warrant and, uh, or the arrest warrant or whatever you have." *Id.* at 4 (Page ID #942). Agent Lotoczky said he would "show it to you in a little while," and Crumpton reiterated his desire to see the search warrant. *Id.* at 4–5 (Page ID #942–43). At this point, Lotoczky returned to a discussion of Crumpton's *Miranda* rights, and Crumpton flatly stated "I want to see the search warrant before I sign anything," then asking if "[i]t's like I'm giving consent then if I waive anything," seeming to think that the *Miranda* waiver would reflect his consent to the search of his home. *Id.* at 5 (Page ID #943). Agent Lotoczky clarified that "the search warrant is for the house," explaining that "[w]hat this is saying is that I read to you your rights and you understand your rights" and "that we can talk . . . . And if you don't want to talk, you don't have to talk." *Id.* at 5–6 (Page ID #943–44).

During the ensuing interrogation, Crumpton said more about the ammunition ("the Second Statement"): (1) "I know of some bullets up there," *id.* at 10 (Page ID #948); (2) "I found some bullets and they just set em' up there," *id.*; and (3) "Them bullets was just there 'cause the mothafucka said, dude, I need some bullets and, or whatever, and no, I just say, leave 'em here, I probably know somebody that do, so," *id.* at 24 (Page ID #962). Lotoczky began to turn the conversation toward the subject of drug dealing, and Crumpton repeatedly interrupted to ask to see a copy of the search warrant. *See id.* at 14–15 (Page ID #952–53). Ultimately, Lotoczky asked another officer to retrieve a copy of the search warrant and then showed Crumpton the warrant. *See id.* at 15, 20 (Page ID #953, 958). Although Crumpton largely answered Lotoczky's questions throughout the interrogation, he declined to answer questions

about the value of the narcotics seized from the house, *id.* at 21–22 (Page ID #959–60), and how long the narcotics that were found in the residence had been there, *id.* at 24 (Page ID #962).

**B. Procedural History**

Crumpton was charged with being a felon in possession of ammunition and with possession with the intent to distribute cocaine, cocaine base, heroin, and marijuana. *See* R. 6 (Indictment) (Page ID #11–14). He twice moved pretrial to suppress evidence obtained during the search of the Sloan Street Residence, first on the grounds that the search warrant was not supported by probable cause and failed to identify with sufficient particularity the house to be searched, and later on the grounds that agents had violated Federal Rule of Criminal Procedure 41 by failing to leave a copy of the warrant after completing the search. *See* R. 14 (First Mot. to Suppress) (Page ID #73–86); R. 32 (Second Mot. to Suppress) (Page ID #155–66). The district court denied both motions. *See* R. 71 (Tr. of March 25, 2014 Suppression Hearing at 12:9–13) (Page ID #1013); R. 40 (Tr. of July 24, 2014 Suppression Hearing at 38) (Page ID #318).

Crumpton's trial began on September 3, 2014. At the close of the government's case, Crumpton's attorney raised for the first time a request to suppress Crumpton's First Statement: "Your Honor, I have a concern that when I listened to the tapes, that I missed a point on the Miranda warnings because of a bit of a belief that an essential warning is a warning to the person that is being questioned that he may discontinue the questioning." R. 52 (Trial Tr. Vol. 3 at 40:9–13) (Page ID #500). After the government stated that the Second Warnings included that warning, the district court asked Crumpton's lawyer: "So, the second statement there's no challenge to." *Id.* at 42:18 (Page ID #502). Crumpton's lawyer responded: "No, Your Honor." *Id.* at 42:19 (Page ID #502). The district court then ruled that "the first statement cannot be used in closing argument. The second may." *Id.* at 42:23–24 (Page ID #502). The district court denied Crumpton's oral motion for judgment of acquittal on the possession-of-ammunition count, *id.* at 45:2–6 (Page ID #505), and the jury later convicted Crumpton of both charges, R. 43 (Verdict Form) (Page ID #342).

Afterwards, Crumpton moved for judgment of acquittal on the possession-of-ammunition count on the grounds that there was insufficient evidence that he possessed the bullets and that

the now-suppressed First Statement had been presented to the jury and could have affected the verdict. *See* R. 44 (Mot. for J. of Acquittal) (Page ID #343–46); R. 44-1 (Mem. in Supp.) (Page ID #347–58). The district court granted Crumpton's motion, finding sua sponte that the Second Warnings were deficient under *Miranda* and that Crumpton's waiver of rights in response to those warnings was not knowing and voluntary, making the Second Statement inadmissible. *See* R. 51 (Opinion at 7, 12–23) (Page ID #437, 442–53). Because this rendered the evidence insufficient to convict Crumpton of the ammunition charge, the district court granted Crumpton's motion for judgment of acquittal. *See id.* at 29 (Page ID #459). In the alternative, the district court granted Crumpton a new trial, holding that the initial admission of the First Statement so tainted the jury's verdict that a new trial was necessary. *See id.* at 26–27. The government timely appealed this order, R. 57 (Gov't's Notice of Appeal) (Page ID #868), and Crumpton timely appealed his narcotics conviction, *see* R. 65 (Notice of Appeal) (Page ID #901).

## II. ANALYSIS – GOVERNMENT'S APPEAL

In challenging the district court's grant of Crumpton's motion for judgment of acquittal and conditional grant of a new trial, the government challenges the district court's after-the-fact suppression of Crumpton's statements. We begin our analysis with the Second Statement, the exclusion of which prompted the district court to grant Crumpton's motion for judgment of acquittal. Because that exclusion was erroneous, we consider the Second Statement in assessing the sufficiency of the evidence to support the jury's verdict. Finding the evidence sufficient, we **REVERSE** the district court's grant of Crumpton's motion for judgment of acquittal. We then proceed to the district court's grant of a new trial, which we **REVERSE** because it was premised on the prejudicial effect of the First Statement, but the First Statement was improperly excluded. Accordingly, we **REINSTATE** the jury's verdict and **REMAND** for resentencing.

## A. Exclusion of the Second Statement[1]

### 1. Content of *Miranda* Warning

The district court premised its suppression of the Second Statement in part on its concern that Agent Lotoczky misled Crumpton into believing that he would never go to court in connection with statements he might give to law enforcement, and thereby nullified the *Miranda* warning that anything Crumpton said could be used against him in court. *See* R. 51 (Opinion at 12–15) (Page ID #442–45). This was based upon the district court's reading of the following exchange between Agent Lotoczky and Crumpton:

Agent: Anything you say can be used against you in court. You understand that?

KC: Yes. Um hmm.

Agent: Okay.

KC: Will we be going to court?

Agent: No, I'm just saying, in general. Anything you say can be used against you in court. That's, these are your rights. I'm just, reading, reading them to ya on, off a piece of paper.

R. 68-2 (Tr. of Audio Recording at 3) (Page ID #941). The district court viewed Agent Lotoczky as "directly contradict[ing]" the required warning that any statements could be used against Crumpton in court. *See* R. 51 (Opinion at 13) (Page ID #443).

We review the district court's findings of fact regarding a motion to suppress for clear error and its legal conclusions de novo. *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010). Generally, "the adequacy of *Miranda* warnings is treated as a question of law." *United States v. Wooten*, 602 F. App'x 267, 272 (6th Cir. 2015). Crumpton asks that the district court's decision be reviewed for clear error, Crumpton Appellee Br. at 29, but the question before us is a

---

[1]The appropriateness of the district court's sua sponte suppression of the Second Statement is itself questionable because "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)). For that reason, "before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions." *Day v. McDonough*, 547 U.S. 198, 210 (2006). The district court did not follow this path, but we nonetheless rest our decision on the merits of the district court's decision alone.

legal one: Given the undisputed words that were said and the undisputed recording of them, were the Second Warnings legally sufficient? *See United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012) (applying de novo review where a *Miranda* issue was raised involving an interrogation captured on an undisputed videotape because "[t]he parties do not disagree in any material way about the words that [the defendant] spoke when he referenced his right to an attorney" and "[i]nstead, they take issue with the legal effect of those words, and that is a question of law"). We therefore review this issue de novo.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court mandated that four warnings be given to inform a suspect in police custody of certain rights in order to protect the privilege against self-incrimination. One such warning was phrased in the opening section of the Supreme Court's opinion as notice "that any statement he does make may be used as evidence against him." *Id.* at 444. At two later points in the opinion, the Supreme Court suggested that the warning would use the phrase "in court." *See id.* at 469 ("that anything said can and will be used against the individual in court"); *id.* at 479 ("that anything he says can be used against him in a court of law"). We have sometimes phrased the warning without the "in court" language. *See United States v. Tillman*, 963 F.2d 137, 141 (6th Cir. 1992) (finding *Miranda* warnings to be inadequate where they omitted any warning regarding the consequences of waiving the privilege against self-incrimination, and describing the defect as the fact that the "[d]efendant was never told [that] any statements that he would make could be used against him"). The varying use of the phrase "in court" is unsurprising, given that the Supreme Court "has not dictated the words in which the essential information must be conveyed," and "[t]he inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Florida v. Powell*, 559 U.S. 50, 60 (2010) (internal quotation marks and brackets omitted); *see also Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) ("Reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement.").

The warning seeks to convey "the consequences of forgoing [the privilege against self-incrimination]" and "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest." *Miranda*, 384 U.S. at 469. In keeping with this purpose, two other Circuits have specifically

held that a warning that omits the "in court" language does not violate *Miranda*. In *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007), the Eighth Circuit reiterated a prior holding that the contention "that [a suspect] did not know the full extent of his rights because the interpreter only informed him that anything he said could be used against him, instead of informing him that anything he said could be used against him in court, is also without merit." *See also Evans v. Swenson*, 455 F.2d 291, 295–96 (8th Cir. 1972) (finding, with little explanation, that a warning phrased as "any statement you do make could be used against you" was an appropriate conveyance of "the risk or consequences of not [remaining silent]"). The Fourth Circuit was more thorough, explaining that omitting the words "in court" was acceptable because the warning became even stronger by "unequivocally convey[ing] that *all* of [a suspect's] statements could be used against him anytime, anywhere, including a court of law." *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996). Finally, the Tenth Circuit arguably hinted in this direction in a case in which a Spanish-speaking suspect was given a complete "written *Miranda* warning in Spanish at the start of the interview," but after an officer decided instead to give an oral warning, the suspect received a translation that suggested only "that anything she said may be to her detriment and could be used against her 'according to the law.'" *United States v. Hernandez*, 93 F.3d 1493, 1497 (10th Cir. 1996). The Tenth Circuit found that this oral warning "convey[ed] the essence of the *Miranda* warning . . . that anything she said could be used against her." *Id*. at 1502. We agree that use of the term "in court" certainly helps to ensure a suspect's awareness of both the "consequences of forgoing" the privilege against self-incrimination and the fact "that he is faced with a phase of the adversary system," *Miranda*, 384 U.S. at 469, but it is not the only way to do so. A suspect who is informed of his right to remain silent and the fact that failing to do so will result in his statements being used "against him" is sufficiently informed of the key information the warning seeks to provide. Thus, Agent Lotoczky was not required to add the words "in court" to his warning to Crumpton.

Nor did Agent Lotoczky undermine or contradict the point of the warning by answering "[n]o" when Crumpton asked "[w]ill we be going to court." R. 68-2 (Tr. of Audio Recording at 3) (Page ID #941). Agent Lotoczky actually said "[n]o, I'm just saying, in general. Anything you say can be used against you in court. That's, these are your rights." *Id*. Far from indicating that Crumpton would never go to court and thus could waive his right to remain silent without

consequence, this answer clarified that Agent Lotoczky was not telling Crumpton what would happen next that day, but instead was informing Crumpton of his rights and the consequences of waiving them. The district court brushed this aside as failing to "correct the misinformation he had just provided," R. 51 (Opinion at 13 n.6) (Page ID #443), but it in fact serves to bolster the conclusion that Agent Lotoczky conveyed the full range of necessary information, as Agent Lotoczky reiterated that Crumpton's statements could be used against him, and added the helpful—but not required—explanation that they could be used "in court." This is therefore not a case in which a warning was flatly contradicted by a subsequent statement. *See, e.g.*, *Hart v. Attorney General*, 323 F.3d 884, 894 (11th Cir.) (after proper warning regarding the right to counsel, suspect asked "for a clarification of his right to counsel, and [a law-enforcement officer] responded by telling him that the disadvantage of having a lawyer present was that the lawyer would tell [the suspect] not to answer incriminating questions" and the officer later told the suspect that "honesty wouldn't hurt him"), *cert. denied*, 540 U.S. 1069 (2003). The Second Warnings were therefore adequate under *Miranda*.

## 2. Knowing and Voluntary Waiver

Even when proper *Miranda* warnings are given, a suspect's subsequent statements may be suppressed if the suspect's waiver of *Miranda* rights was not made "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. There are "two distinct dimensions" to this assessment: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In assessing whether a waiver was knowing and voluntary, "this court looks at the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (internal quotation marks omitted), *cert. denied*, 515 U.S. 1145 (1995). "The relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to

discontinue talking at any time.'" *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir.) (en banc) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)), *cert. denied*, 558 U.S. 850 (2009).

The district court relied on this doctrine as an alternate ground for suppressing the Second Statement, concluding that Crumpton's waiver of rights was neither knowing nor voluntary. *See* R. 51 (Opinion at 15–23) (Page ID #445–53). As for the adequacy of the warnings themselves, these issues present no real dispute about the facts; rather, the district court drew inferences from the undisputed transcript and audio recording, but those inferences speak to the legal effect of the words that were said. De novo review is therefore applicable. *See Al-Cholan*, 610 F.3d at 953 ("This court reviews a trial court's legal conclusions on *Miranda* waivers de novo, and findings of fact underlying those conclusions for clear error.") (internal quotation marks omitted).

The district court found Crumpton's waiver to be involuntary in part due to deception by Agent Lotoczky regarding whether Crumpton would go to court and Agent Lotoczky's statement that "there was 'nothing on [Defendant] yet.'" R. 51 (Opinion at 15–16) (Page ID #445–46). As discussed previously, Agent Lotoczky did not deceive Crumpton into thinking that he would *never* go to court or that his statements could not otherwise be used against him. *See supra* Part II.A.1. The district court's conclusion that Crumpton was also deceived by a statement implying that the officers had "nothing on [Defendant] yet" is not supported by the record. The district court was referring to a statement that is transcribed—in an undisputed transcript—as follows:

> Agent: We are going to going [sic] through this line by line. I'm not gonna try to hoodwink you here or try to do anything unsha, you know, shady here, you know.
>
> [Unidentified]: I was going to say, it sounds like he dealt with someone shady looking for carpet or something.
>
> [Laughter]
>
> Agent: *No, no, nothing on here yet.*

R. 68-2 (Tr. of Audio Recording at 7) (Page ID #945) (emphasis added). The audio recording does not reveal anything to support a reading of that statement—"nothing on here yet"—as indicating that the agents did not have any "evidence" on "Crumpton." The statement came amidst a discussion of Crumpton's potential waiver of his *Miranda* rights, and if anything, appears to have been an aside to another agent indicating that Crumpton had not yet signed the

waiver-of-rights form. *See* Gov't Appellant Br. at 36. Accordingly, the district court erred in finding that Crumpton was deceived.

The district court was also wrong to hold that Crumpton was coerced into waiving his rights. *See* R. 51 (Opinion at 15–20) (Page ID #445–50). First, it found that Agent Lotoczky indicated that he would show Crumpton the search warrant only if Crumpton waived his *Miranda* rights, but such a condition is absent from the conversation. Second, although the district court raised an arguable point regarding Crumpton's statement that he wanted to see the search warrant before signing anything, the context of that statement shows that Crumpton was concerned about consenting to the *search* and thereby waiving the right to challenge the search warrant. *See* R. 68-2 (Tr. of Audio Recording at 5–6) (Page ID #943–44). Once that confusion was cleared up, Crumpton signed the written waiver form, itself "strong proof of the validity of th[e] waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Third, the discussion of Crumpton's girlfriend was brief (and it came *after* Crumpton waived his *Miranda* rights): Agent Lotoczky asked what she would say if he asked her whether the drugs in Crumpton's house belonged to her, and Crumpton responded that "[s]he don't, she don't have nothing to do with this." *See* R. 68-2 (Tr. of Audio Recording at 22) (Page ID #960). Fourth, the district court pointed to only a single instance of Crumpton supposedly being interrupted and belittled—an instance when another agent briefly joined the conversation. *See* R. 51 (Opinion at 17) (Page ID #447); R. 68-2 (Tr. of Audio Recording at 7) (Page ID #945). Finally, the fact that Crumpton was put outside in the cold certainly plays into the totality-of-circumstances analysis, but it is a single factor that is outweighed by other factors, including the fact that Crumpton was twice advised of his *Miranda* rights and given a written waiver that he signed, the relatively brief time during which Crumpton was interviewed, and Crumpton's extensive prior experience with the criminal justice system. *See Ledbetter*, 35 F.3d at 1067, 1070. Under the totality of the circumstances, it was erroneous to conclude that Crumpton's waiver was a product of coercion.

It was also error to conclude that Crumpton did not knowingly waive his rights. The district court based its finding on Crumpton's "reliance on his belief that he was not going to court, and thus that his statements would not be used against him in court." R. 51 (Opinion at 20) (Page ID #450). The district court reiterated its argument regarding Crumpton's

comprehension of the waiver form, but this misreads the Agent's attempts to educate Crumpton about the difference between waiving *Miranda* rights and consenting to a search. The district court also resurrected its concern that Crumpton was not properly warned because "going to court is an explicitly required consequence of which suspects must be warned." R. 51 (Opinion at 21) (Page ID #451). This is an inaccurate understanding of *Miranda*, *supra* Part II.A.1, and it is difficult to say that Crumpton was not aware of his right to remain silent and the consequences of waiving that right when Crumpton selectively declined to answer certain questions regarding the narcotics that were located in his home. *See* R. 68-2 (Tr. of Audio Recording at 21–22, 24) (Page ID #959–60, 962). Accordingly, there was no basis to hold that Crumpton's waiver of rights was not a knowing one.

## B. Sufficiency of the Evidence

The district court's grant of Crumpton's motion for judgment of acquittal was premised on its suppression of the Second Statement. *See* R. 51 (Opinion at 1–2) (Page ID #431–32). Our holding that each of the district court's reasons for suppressing the Second Statement was erroneous thus erodes the foundation for granting a judgment of acquittal. The government requests that we then reverse "the corresponding judgment of acquittal" and reinstate the verdict. Gov't Appellant Br. at 16. Crumpton twice argued before the district court that the trial evidence—*including the Second Statement*—was insufficient to support his conviction. When he raised the argument at trial, the district court disagreed, holding that the Second Statement supplied a sufficient connection to the ammunition. *See* R. 52 (Trial Tr. Vol. 3 at 43:14–45:6) (Page ID #503–05). When Crumpton raised the argument in his written motion for judgment of acquittal, R. 44-1 (Br. in Supp. of Mot. for J. of Acquittal at 6–12) (Page ID #352–58), the district court did not rule because it excluded the Second Statement. We find that the evidence, when the Second Statement is considered, is sufficient to support the jury's verdict, as the district court held during trial.

"In reviewing a claim that the evidence at trial was insufficient to sustain a conviction, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Carter,* 465 F.3d 658, 664 (6th Cir. 2006) (quoting *United*

*States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003)), *cert. denied*, 550 U.S. 964 (2007).  To convict Crumpton for being a felon in possession of ammunition, the jury needed to find that he possessed the ammunition. *See United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013).  This may be satisfied by showing that Crumpton had constructive possession of the ammunition, which "exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others."  *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)), *cert. denied*, 525 U.S. 1166 (1999).

Crumpton's affiliation with and control over the front area of the Sloan Street Residence, when combined with his statement regarding his involvement in placing the ammunition in the house and holding it for someone else, is sufficient to support a jury finding of constructive possession.  We have held that "[p]roof that 'the person has dominion over the premises where the [item] is located' is sufficient to establish constructive possession.'"  *Id.* (quoting *United States v. Clemis*, 11 F.3d 597, 601 (6th Cir. 1993)).  And although "nonexclusive possession of the premises cannot establish constructive possession over items found within the premises," such an inference is appropriate when "there are other incriminating statements or circumstances tending to buttress such an inference." *United States v. Bailey*, 553 F.3d 940, 944 n.3 (6th Cir. 2009) (quotation marks omitted).  Accordingly, Crumpton's nonexclusive control over the front area of the house—which a jury could infer from his access to that area and the fact that he stored many of his belongings in that area—is a basis for finding constructive possession because Crumpton said that he knew of the bullets and indicated that he had "found" them, later explaining that another person brought them by, asked whether Crumpton needed them, and Crumpton said "leave 'em here, I probably know somebody that do."  R. 68-2 (Tr. of Audio Recording at 10, 24) (Page ID #948, 962); *see United States v. Newsom*, 452 F.3d 593, 609 (6th Cir. 2006) (relying in part on a defendant's statements to law enforcement that he knew of the existence of a firearm found in his vehicle and had previously "actually possessed it" to support a finding of constructive possession).  Accordingly, we **REVERSE** the district court's grant of Crumpton's motion for judgment of acquittal on the possession-of-ammunition charge.

**C. Conditional Grant of New Trial**

In granting Crumpton's motion for judgment of acquittal, the district court was required to "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). The district court found that Crumpton would be eligible for a new trial if the judgment of acquittal were reversed because the First Statement was prejudicially admitted to the jury before the district court found it to have been obtained in violation of *Miranda*. *See* R. 51 (Opinion at 27) (Page ID #457). Our reversal of the district court's grant of Crumpton's motion for judgment of acquittal means that "the trial court must proceed with the new trial unless the appellate court orders otherwise." Fed. R. Crim. P. 29(d)(3)(A). The government asks that we reverse the conditional grant of a new trial as well. *See* Gov't Appellant Br. at 15, 45.

The district court premised its grant of a new trial on the allegedly prejudicial improper admission of the First Statement. We need not analyze the legal standard for determining whether improperly admitted evidence was sufficiently prejudicial to warrant a new trial, however, because we disagree that the First Statement's admission was even improper.

Although we do not have jurisdiction to review an appeal by the government of a mid-trial decision on a motion to suppress, we do have jurisdiction over appeals "by the United States . . . from a decision, judgment, or order of a district court . . . granting a new trial after verdict or judgment, as to any one or more counts, or any part thereof, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." 18 U.S.C. § 3731. Section 3731 "is to be liberally construed to effectuate its purposes," *United States v. Lawrence*, 555 F.3d 254, 259 (6th Cir. 2009), *cert. denied*, 559 U.S. 1009 (2010), and "[t]he Supreme Court has stated that the purpose of section 3731 is 'to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit,'" *United States v. Layton*, 720 F.2d 548, 554 (9th Cir. 1983) (quoting *United States v. Helstoski*, 442 U.S. 477, 487 n.6 (1979)), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008). It would therefore be strange to preclude our review of whether the First Statement was improperly admitted, when we are clearly able to review the appropriateness of the district court's conditional grant of a new trial, which was premised

entirely upon the prejudicial effect of the assertedly improper admission of the First Statement. *See United States v. Harshaw*, 705 F.2d 317, 318–20 (8th Cir. 1983) (finding jurisdiction to review a grant of a mistrial where the district court had held "that the government failed to establish the existence of a conspiracy between [the defendant] and [a witness], thereby rendering [the witness's] hearsay statements inadmissible," because hearing the appeal would neither violate the Double Jeopardy Clause nor "interrupt an ongoing trial"). We therefore proceed to the merits of the district court's exclusion of the First Statement.

The district court excluded the First Statement based on its belief that *Miranda* requires that a suspect be warned of his right to cease answering questions at any time during a custodial interrogation. *See* R. 52 (Trial Tr. Vol. 3 at 42:23–24, 46:4–7) (Page ID #502, 506). This is a misreading of *Miranda*, which mandated that a suspect undergoing custodial interrogation be informed of four particular rights: (1) "that he has a right to remain silent"; (2) "that any statement he does make may be used as evidence against him"; (3) "that he has a right to the presence of an attorney"; and (4) that the attorney may be "either retained or appointed." 384 U.S. at 444. Subsequent Supreme Court decisions have echoed these four—and only four— required warnings. *See, e.g.*, *Powell*, 559 U.S. at 59–60; *Spring*, 479 U.S. at 567 n.1.[2] We and other circuits have made clear that "a defendant need not be informed of a right to stop questioning after it has begun." *United States v. Lares-Valdez*, 939 F.2d 688, 689 (9th Cir. 1991); *see also United States v. Davis*, 459 F.2d 167, 168–69 (6th Cir. 1972) (describing the contention that *Miranda* was violated where a suspect "was not clearly apprised of the fact that he could terminate any questioning" as "without merit"); *United States v. Ellis*, 125 F. App'x 691, 699 (6th Cir. 2005) ("a statement instructing [the suspect] that he has the right to stop answering questions at any point after questioning has begun[] is not a phrase that the Supreme Court in *Miranda* suggested should be read to criminal suspects before interrogation"). The district court therefore erred in holding that the First Statement was a product of an inadequate

---

[2]In its Opinion granting Crumpton's motion for judgment of acquittal, the district court suggested in a footnote that the fifth warning is required by the Supreme Court's decision in *Spring*. *See* R. 51 (Opinion at 4 n.1) (Page ID #434) (citing *Spring*, 479 U.S. at 573–74). But *Spring* does not mandate that a defendant be provided that explicit fifth warning, and itself listed the four standard warnings as all that are required. *See Spring*, 479 U.S. at 567 n.1.

*Miranda* warning.**[3]** Because the First Statement was properly admitted, we reject the district court's conclusion that it had a legally prejudicial effect on the jury and therefore **REVERSE** its conditional grant of a new trial.**[4]**

### III. ANALYSIS – CRUMPTON'S APPEAL

In a separate appeal, Crumpton contests his narcotics conviction, arguing that the district court erred in denying his motions to suppress the evidence that was seized from the Sloan Street Residence during the search of the home, and that the prosecutor engaged in misconduct during her closing argument. We find no merit to either contention and **AFFIRM** the conviction.

### A. Search of Crumpton's Residence

Before trial, Crumpton filed two motions to suppress, each of which sought to suppress the evidence recovered during the search of the Sloan Street Residence. His first motion argued that the search warrant did not adequately describe the location to be searched because of an incorrect address, and that the warrant was not supported by probable cause. The district court denied that motion and Crumpton obtained new counsel, who filed his second motion, arguing that the search was invalid because law enforcement failed to leave a copy of the search warrant at the Sloan Street Residence, in violation of Federal Rule of Criminal Procedure 41. The district

---

**[3]**Nor do we accept Crumpton's argument—newly raised on appeal—that his waiver of *Miranda* rights was neither knowing nor voluntary because he was not told of his right to cut off questioning at any time. *See* Crumpton Appellee Br. at 19. In assessing whether a waiver of *Miranda* rights was knowing and voluntary, "[t]he relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.'" *Garner*, 557 F.3d at 261 (quoting *Spring*, 479 U.S. at 574). Although we have indicated that a suspect's knowledge of the ability to cut off questioning at any time may be relevant to the voluntariness analysis, *United States v. Ricks*, No. 92-5503, 1993 WL 78781, at *3 (6th Cir. Mar. 19, 1993) (per curiam), *cert. denied*, 508 U.S. 945 (1993), it is difficult to see how the bare fact that Crumpton was not specifically told of his right to cut off questioning could render his waiver involuntary, given our binding precedent that failing to warn a suspect of that right will not invalidate a *Miranda* warning. *See Davis*, 459 F.2d at 168–69.

**[4]**The district court added as a basis for granting a new trial that "the curative jury instruction implicated the accused's right to remain silent." R. 51 (Opinion at 27) (Page ID #457). The district court's curative instruction was abrupt, coming after the First Statement had been admitted and stating, without context, "I will tell the jury that that first statement is not to be considered for any purpose." R. 52 (Trial Tr. Vol. 3 at 46:17–19) (Page ID #506). This instruction was vague enough to prompt a note from a juror asking "[w]hat was the statement"—to which the district court responded "[i]f I were to tell you what the statement was, I would be making it even harder for you to forget it," *id.* at 75:2–6 (Page ID #535)—but we do not see how the instruction could be construed as a comment on Crumpton's right to remain silent.

court denied this motion as well.  Crumpton challenges these rulings on appeal, and adds an additional argument that the search warrant did not adequately describe the location to be searched because it did not specify which of the apartments in the Sloan Street Residence were to be searched.

### 1.  Particularity

The Fourth Amendment mandates that any warrant must "particularly describ[e] the place to be searched." U.S. CONST. amend. IV.  "In determining whether a warrant describes with sufficient particularity the place to be searched, we consider:  '(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched.'" *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005) (quoting *United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir. 1989)). "[T]echnical inaccuracies in a warrant do not automatically render unconstitutional searches conducted pursuant to such a warrant," so the issue is whether the description is sufficient, not whether it is perfect. *Id.* at 569.

Crumpton first argues that the warrant was not sufficiently particular because it did not accurately describe the Sloan Street Residence.  Crumpton relies on the fact that the warrant was for "two (2) residential structures located in the vicinity of [the] property lot at 761 South Sloan Street, Detroit, MI," R. 15-1 (Search Warrant at 1) (Page ID #101), when the address is actually 735 South Sloan Street, Crumpton Appellant Br. at 15–16.

Crumpton is right that such an error could lead to an unacceptable likelihood that officers would be unable "to locate and identify the premises with reasonable effort" and thus create a "reasonable probability that some other premises may be mistakenly searched." *Knott*, 418 F.3d at 568 (quoting *Gahagan*, 865 F.2d at 1497).  But such an error does not invalidate a search warrant if the warrant includes other specific descriptors that remove the probability that the wrong location could be searched, especially when the warrant affiant participates in the execution of the search. *See, e.g., United States v. Hang Le-Thy Tran*, 433 F.3d 472, 480 (6th Cir.) (warrant misidentified address, but correctly located the place to be searched as "on 28th

Street, S.W. in the 900 block" and as having "a portioned-off storage room in the lower level of that building," and "[t]he executing officer . . . was also the warrant's affiant"), *cert. denied*, 549 U.S. 903 (2006); *United States v. Pelayo-Landero*, 285 F.3d 491, 497 (6th Cir. 2002) (warrant may have misidentified address, but "include[d] specific directions from an identifiable point," "describe[d] the particular trailer by color, by a certain exterior trim, and by a wooden deck," as well as the "unusual feature" of "the number 954 displayed under a window air conditioner on the right end of the trailer," included a photograph of the trailer, and an affiant "was the team leader at the search").

The warrant in this case included such information. It identified the Sloan Street Residence as being "in the vicinity of [the] property lot at 761 South Sloan Street, Detroit, MI," R. 15-1 (Search Warrant at 1) (Page ID #101), which is not wrong—735 South Sloan Street is, after all, in the vicinity of 761 South Sloan Street. In any event, the Sloan Street Residence was the only residential structure on that side of the 700 block of South Sloan Street, and the warrant included a number of additional descriptors—including a blurry photograph—that ensured that the correct building would be searched. *See id.* (describing the residence as "a 1 1/2–story, single family residence, with blue siding, white trim" that had "an[] additional sub-structure present [at] the rear of the location," which was described as "located immediately off the east side (rear) of the primary residence within the same property lot, but containing a separate exterior entrance"). Finally, Officer Farris, the search warrant affiant, participated in the execution of the search warrant, after having been to the house previously. *See id.*; R. 54 (Trial Tr. Vol. 1 at 43:19–23, 45:17–47:1) (Page ID #793, 795–97). The warrant therefore sufficiently described the Sloan Street Residence.[5]

Crumpton's second argument is that the warrant fails the particularity requirement because it did not identify which of the apartments within the Sloan Street Residence were to be

---

**5**Crumpton asserts that the house has the number "735" on it, but there is no merit to any suggestion that officers should have noticed this number and acted differently. Agent Lotoczky testified during a suppression hearing that "the address was hidden by part of a fence and maybe a shrub on the side of the house – actually right in front of the house, on the corner of the house." R. 39 (Tr. of July 7, 2014 Hearing at 11–12) (Page ID #259–60). Nor would learning the home's precise address have changed or contradicted anything in the warrant or affidavit, as the warrant acknowledged that the number 761 was an approximation. *See* R. 15-1 (Search Warrant at 1) (Page ID #101).

searched, and the officers erred in continuing to search after they should have noticed that the home was broken up into separate apartments. *See* Crumpton Appellant Br. at 18. As the government notes, this argument was not made in either of Crumpton's motions to suppress. Arguably, however, Crumpton properly raised the issue pro se before the district court by mentioning it during both hearings on his First Motion to Suppress. *See* R. 70 (Tr. of Feb. 28, 2014 Hearing at 14:4–7) (Page ID #996) ("I'm trying to contest the warrant on a particularity requirement, which they have it marked as a single home and it's a four-apartment dwelling."); R. 71 (Tr. of Mar. 25, 2014 Hearing at 9:4–18) (Page ID #1010) (emphasizing that "the warrant that was shown to me had 735 Sloan with no apartment number" and agreeing with the district court's phrasing of his argument as "the only problem with [the warrant was] that it didn't have the apartment number"). The government argues that this issue was either waived or forfeited, but we need not decide whether Crumpton's pro se arguments were sufficient to raise the issue because we find that the district court did not err at all on the record that was presented to it.

As a general rule, "[a] warrant describing an entire building when cause is shown for searching only one apartment is void." *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1976). "[W]hen the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *United States v. Shamaeizadeh*, 80 F.3d 1131, 1137 (6th Cir. 1996) (internal quotation marks omitted). When a warrant is obtained for an entire structure, it is invalid if law enforcement "had known, or should have known," that the location was divided into separate units. *Maryland v. Garrison*, 480 U.S. 79, 85–86 (1987). Furthermore, law enforcement officers are "required to discontinue [a] search . . . as soon as they discover[]" that a location is in fact subdivided into separate dwelling units, especially if it is unclear which unit belongs to the subject of the warrant. *Id.* at 87. "[T]he validity of the search . . . depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88.

The record contains little to suggest that the government could have known prior to the search that the residence was subdivided. The investigation did not reveal the existence of subdivided apartments. R. 53 (Trial Tr. Vol. 2 at 64:24–65:6) (Page ID #667–68) (Officer Farris testifying that the residence appeared to be a single-family home from the outside); *cf.* R. 15-1

(Search Warrant ¶ 3) (Page ID #102) ("Through the course of this investigation, affiant was unable to observe any numbers affixed to the residence."). And although there were multiple mailboxes in front of the house, R. 53 (Trial Tr. Vol. 2 at 57:19–58:1) (Page ID #660–61), it is not clear how visible they were.**6** The evidence in the record also suggests that any apartment numbers that may have existed were not easily visible. *See id.* at 122:20–23 (Page ID #725). Accordingly, aside from the existence of multiple mailboxes of indeterminate visibility, the record reflects nothing that could have notified the agents that they were looking at a dwelling with multiple apartments. This is not sufficient to put law enforcement on notice. *See United States v. Brooks*, 294 F. App'x 71, 73 (4th Cir. 2008) (officer's failure to notice multiple mailboxes and doorbells was reasonable where they were difficult to see and the officer observed the building at night from across the street).

Crumpton presents a closer question with respect to what the agents would have learned upon executing the search warrant. Although there is no evidence that officers saw apartment numbers during the search, they did find that the structure was divided between the front and back of the house. To be sure, "[t]here was an access way that would allow someone to move about the house from the front to the back," but "[i]t was a small kind of hole in the wall." R. 53 (Trial Tr. Vol. 2 at 9:21–23) (Page ID #612). Nor does it appear to have been a normal passageway akin to an unlocked door. *See id.* at 110:2–4 (Page ID #713) (ATF Agent Lotoczky: "[I]t looked to me that you could fit through there if you want, that you could squeeze through there."); R. 68-2 (Tr. of Audio Recording at 17–18) (Page ID #955–56) (when asked whether he is "able to slip through that little, little hole through that, through that wall there," Crumpton responded that the hole had been created "to fix some wiring" and that he does not use the hole to pass from the front to the back portion of the house). Thus, unlike in the case cited by the government, there was a clearer delineation between the front and back portions of the house. *See United States v. White*, 416 F.3d 634, 639 (7th Cir. 2005) (house "d[id] not have the typical distinctions that designate separate apartments" as "[t]he living areas on both floors are not

---

**6**Crumpton refers to a video of the execution of the search warrant on this point, which was introduced at trial as Exhibit 31 and was played for the jury. *See* R. 54 (Trial Tr. Vol. 1 at 48:12–50:18) (Page ID #798–800); R. 53 (Trial Tr. Vol. 2 at 5:11–23) (Page ID #608). The video was not made part of the district court's electronic record, however, nor was it forwarded to this court for purposes of appeal. Because the video has not been made part of the record before us, we cannot evaluate its effect on the case.

separate from each other," "[t]here is no indication that a person who lives downstairs could not go upstairs," and "[t]here do not appear to be any internal locks separating the allegedly distinct parts of the . . . house").

The manner in which the house was laid out did not suggest that there were separate living areas, however. The various rooms in the house that could have been set up as bedrooms were not, with only the back bedroom set up that way and the others appearing more like living rooms and storage for various items. *See* R. 53 (Trial Tr. Vol. 2 at 10:23–11:5, 12:19–25, 64:5–11, 65:12–20) (Page ID #613–15, 667–68). Some of the belongings that Crumpton claimed during his conversation with Agent Lotoczky, including his pet snake and electronic equipment, were also found in the front area of the house. *See* R. 68-1 (Tr. of Audio Recording at 2) (Page ID #935); R. 68-2 (Audio Recording Tr. at 1, 11) (Page ID #939, 949). The lack of indicia that the house included any separate living areas, along with the suggestion that Crumpton used the front and back areas of the house, renders the government's belief that the house was a single residence reasonable. *Compare Shamaeizadeh*, 80 F.3d at 1138–39 (police should have known that a basement apartment was a separate residence where "[t]he officers had previously discovered that the door connecting the upper floor and basement floor was locked," an officer "noticed that the apartment had its own den and refrigerator" and a resident of the home "had informed the officers that her access to the basement apartment was restricted"). Accordingly, the agents acted reasonably here in continuing to search the front portion of the house.

## 2. Probable Cause to Support Search Warrant

Crumpton also challenges the adequacy of the affidavit submitted in support of the search warrant, contending that it failed to supply sufficient indicia of reliability regarding the evidence provided by the confidential informant. *See* Crumpton Appellant Br. at 20. We review the district court's findings of fact in connection with a motion to suppress for clear error, and its legal conclusions de novo, but "when judging the sufficiency of an affidavit to establish probable cause in support of a search warrant," we "accord the magistrate's determination great deference." *United States v. Terry*, 522 F.3d 645, 647 (6th Cir.) (internal quotation marks omitted), *cert. denied*, 555 U.S. 904 (2008).

"To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). An affidavit, like this one, that is based on information provided by a confidential informant, prompts us to "consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information." *Id.* at 532 (quoting *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003)). "While independent corroboration of a confidential informant's story is not a *sine qua non* to a finding of probable cause, in the absence of any indicia of the informant's reliability, courts insist that the affidavit contain substantial independent police corroboration." *Id.* (internal citation omitted). At the same time, "independent corroboration of the tip by police is not required when the court is provided with assurances that the informant is reliable." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010). "In such cases, the affiant need only attest 'with some detail' that the informant provided reliable information in the past." *Id.* (quoting *United States v. McCraven*, 401 F.3d 693, 697 (6th Cir. 2005)).

The warrant affidavit was more detailed than Crumpton avers. It explains that Officer Farris "received a tip that a black/male residing in [the Sloan Street Residence] was selling crack-cocaine and heroin from this residence." R. 15-1 (Search Warrant ¶ 3) (Page ID #102). Farris "met with an established confidential informant" who identified Crumpton as the individual who was selling narcotics from the house, and Farris then used that same informant to conduct a controlled purchase of narcotics. *Id.* ¶ 4 (Page ID #102). Farris searched the informant immediately before the purchase, and watched the informant enter and exit the house. *Id.* Farris subsequently learned from the same informant that Crumpton regularly sells narcotics from that location. *See id.* ¶ 5 (Page ID #102). Finally, the affiant swore that the confidential informant "has previously proved to be a credible and reliable source of information, whose past information has led to the successful seizures and confiscations of large quantities of narcotics, prescription pills, illicit narcotics proceeds, and firearms, along with successful criminal convictions of narcotics sellers." *Id.* (Page ID #103).

Officer Farris's close supervision of a controlled purchase of narcotics supplies independent corroboration of the confidential informant's tip. *See United States v. Coffee*, 434 F.3d 887, 893–95 (6th Cir.) (tip was sufficiently corroborated where an officer watched a confidential informant entering and exiting the residence from which narcotics were allegedly being sold and searched the informant before and after the controlled buy), *cert. denied*, 547 U.S. 1158 (2006). Nor is this a case in which the affidavit was entirely lacking in a description of the informant's reliability. Although the informant was not named, "there is no requirement that an informant be named either in the affidavit or the search warrant." *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006), *cert. denied*, 550 U.S. 961 (2007). Instead, "the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). Officer Farris did just that. *See* R. 15-1 (Search Warrant ¶ 5) (Page ID #103). Accordingly, the affidavit was sufficient to support a finding of probable cause.

### 3. Federal Rule of Criminal Procedure 41

Crumpton's Second Motion to Suppress relied on his allegation that the search team failed to leave a copy of the search warrant at the Sloan Street Residence, in violation of Federal Rule of Criminal Procedure 41. The district court denied this motion, relying on testimony from two law-enforcement officers: Agent Lotoczky, who testified that Officer Farris told him that he had left a copy of the search warrant at the residence, and Officer Farris, who testified that he generally left copies of search warrants behind, but could not remember this particular instance. *See* R. 40 (Tr. of July 24, 2014 Hearing at 38) (Page ID #318). Crumpton argues that it was clearly erroneous to credit this testimony because neither agent could confirm that the warrant was left based on personal knowledge. *See* Crumpton Appellant Br. at 25.

Federal Rule of Criminal Procedure 41(f)(1)(C) provides that "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property." Rule 41 provides a statutory rule that is not required by the Fourth Amendment. *Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996); *see also Baranski v. Fifteen Unknown Agents*, 452 F.3d 433, 444 (6th Cir. 2006) (en banc).

"[A]lthough the procedural steps enumerated in [Rule 41] are important and should not be disregarded, they are ministerial and '[a]bsent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search.'" *Frisby*, 79 F.3d at 32 (quoting *United States v. McKenzie*, 446 F.2d 949, 954 (6th Cir. 1971)).

It was not clear error for the district court to rely on the combination of Officer Farris's testimony regarding his normal practice of leaving behind a copy of a warrant after a search, R. 40 (Tr. of July 24, 2014 Suppression Hearing at 6) (Page ID #286), and Agent Lotoczky's testimony that Farris previously told him that he had done so at the Sloan Street Residence, *see* R. 39 (Tr. of July 7, 2014 Suppression Hearing at 9–10, 13–14) (Page ID #257–58, 261–62). The only evidence presented to the contrary came from Crumpton, who was detained during the search and arrested afterward and therefore had no basis for knowing whether a copy of the warrant was left, *id.* at 25–27 (Page ID #273–75), and his mother, who testified to having entered the premises around 5:00 in the afternoon after the search had ended and to not seeing a copy of the warrant while cleaning the interior of the house, R. 40 (Tr. of July 24, 2014 Suppression Hearing at 26) (Page ID #306). Even if the district court had clearly erred, Crumpton has pointed to no basis for finding that he was prejudiced by this error. He was shown a copy of the warrant during his interrogation at the scene of the search, so it is difficult to imagine what prejudice he could have suffered if the agents did not leave a copy of the warrant at the house as well.

## B. Prosecutorial Misconduct

During Crumpton's trial, his mother testified that the ammunition that was found in the Sloan Street Residence had "turned up one day," that she left it in the place where it was ultimately found, that it did not belong to Crumpton, and that the ammunition was not disposed of because two other individuals planned to use it at a firing range. *See* R. 52 (Trial Tr. Vol. 3 at 55:15–58:2) (Page ID #515–18). The prosecutor cross-examined her about the fact that she had not previously mentioned this information when testifying during a prior hearing. *See id.* at 63:23–66:5 (Page ID #523–26). Crumpton's lawyer then mentioned this testimony to negate the government's evidence of possession during his closing argument. *See id.* at 100:9–101:21

(Page ID #560–61). In response, the government made the following statements in its closing argument:

> My final point that I'd like to make to you is he talked about the mother's testimony today.
>
> If the mother had information as to whose bullets they were or whose ammunition they were, why didn't she disclose that prior to trial today? Why didn't she testify to that at a prior hearing? Why didn't she bring that up then?
>
> Do you think that the Government really wants to charge somebody that's innocent?
>
> Never before was that information disclosed. Momma didn't say it. Defendant didn't say it. Defendant's counsel didn't say it. It's the first time we've heard it today.
>
> So, I'm going to ask you to take into consideration all of those things and to think very carefully about the testimony that you've heard and the exhibits that we've entered. And the Government urges you to find beyond a reasonable doubt that this Defendant is guilty of both of the crimes charged.

*Id.* at 106:22–107:13 (Page ID #566–67). Because Crumpton did not object to any of these statements before the district court, we review for plain error. *See United States v. Davis*, 514 F.3d 596, 615–16 (6th Cir.), *cert. denied*, 555 U.S. 835 (2008).

The Supreme Court "has recognized that prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). We conduct this inquiry by "determin[ing] whether the prosecutor's statements were both improper and flagrant." *Davis*, 514 F.3d at 613. Statements may be improper when they are not "based on the evidence in the record," are "calculated to incite the passions and prejudices of the jurors," or are "designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration." *Id.* (quoting *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006)).

Crumpton argues that the prosecutor improperly assumed facts not in evidence by stating that Crumpton's mother had never previously mentioned her knowledge of the ammunition that was recovered from the Sloan Street Residence.  *See* Crumpton Appellant Br. at 34–35.  He objects that the statement "[d]o you think that the Government really wants to charge somebody that's innocent" constituted improper vouching and bolstering of the government's case and witnesses.  *See id.* at 36.  Finally, Crumpton objects that the prosecutor improperly shifted the burden of proof to the defense by implying that Crumpton, his counsel, or his mother was required to "say" something to dispel the government's belief regarding the ammunition.  *See id.* at 35.

Crumpton fails to demonstrate plain error.  Far from mischaracterizing the evidence, the prosecutor's statement that Crumpton's mother had not previously mentioned her knowledge of the ammunition was, in context, referring to the fact that her prior testimony did not mention her knowledge, thereby undermining her credibility and Crumpton's reliance on her testimony.  Neither that statement, nor the statement that Crumpton, his counsel, and his mother did not "say it"—i.e., did not reveal the knowledge to which his mother testified at trial—shifted the burden of proof to Crumpton.  Rather, they responded to Crumpton's argument that the only evidence regarding who owned the bullets came from Crumpton's mother, whose testimony he suggested the jury should find credible.[7]

The other challenged comment—"[d]o you think that the Government really wants to charge somebody that's innocent"—was improper because it tended "to suggest that [the]

---

[7]Amidst this argument, Crumpton may have sought to raise the additional argument that the prosecutor's "say it" statement was an improper comment on Crumpton's exercise of his Fifth Amendment right not to testify. *See* Crumpton Appellant Br. at 36.  The cases Crumpton cited addressed only the burden-shifting issue with one exception.  That exception, *Lockett v. Ohio*, 438 U.S. 586 (1978), does not elaborate the distinct legal standard applicable to such a claim, and Crumpton did not otherwise spell out that analysis, *see Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988) (setting forth a four-factor test for determining whether such a reference is problematic), *cert. denied*, 489 U.S. 1100 (1989).  Generally, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 618 n.9 (6th Cir. 2014) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997)).  Therefore, "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.* (quoting *McPherson*, 125 F.3d at 995–96).  Thus, we decline to review arguments where an appellant fails to offer any "real analysis" of the argument or to elaborate the elements of a particular legal claim.  *See McPherson*, 125 F.3d at 995–96.  The cursory nature of Crumpton's discussion and the lack of exploration of the legal standard applicable to the claim that a prosecutor's statement indirectly implicated a defendant's Fifth Amendment right render the issue insufficient for our review.

defendant is guilty merely because he is being prosecuted or has been indicted." *United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979). But Crumpton cannot show that the comment was flagrant under the plain-error standard. Flagrancy, we have held, is "a pretty high standard." *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999). Statements are found to be flagrant based upon four factors: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Davis*, 514 F.3d at 613 (quoting *Broom*, 441 F.3d at 412). The comment was undoubtedly isolated. Nor does the record indicate that the remark was deliberate, appearing as it did in the midst of a response to Crumpton's reliance on his mother's arguably newfound memory regarding the ownership of the ammunition. Accordingly, the single improper remark is not so flagrant as to warrant reversal of Crumpton's conviction under the plain-error standard.

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of Crumpton's motion for judgment of acquittal or a new trial regarding the ammunition charge, **AFFIRM** Crumpton's narcotics conviction, and **REMAND** for resentencing.