**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0676n.06

**No. 19-5954**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)<br>)</td><td rowspan="9"><strong>FILED</strong><br>Nov 25, 2020<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE<br>UNITED STATES DISTRICT<br>COURT FOR THE EASTERN<br>DISTRICT OF KENTUCKY</td></tr>
<tr><td style="padding-left:2em">Plaintiff-Appellee,</td><td>)<br>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)<br>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>NATHAN WAGONER,</td><td>)<br>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Defendant-Appellant.</td><td>)<br>)</td></tr>
</table>

BEFORE: CLAY, GIBBONS, and NALBANDIAN, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. On April 24, 2019, a jury found Nathan Wagoner guilty of violating 21 U.S.C. § 841(a)(1) on two counts, (1) knowing and intentional distribution of a substance containing methamphetamine and (2) simple possession of 50 grams or more of methamphetamine. He now appeals. For the reasons laid out below, we affirm the district court.

I.

In fall 2017, law enforcement officials were told that Nathan Wagoner was selling methamphetamine in the Laurel County, Kentucky area. The informant, Glenn Purdy, then made a controlled purchase of roughly one ounce from Wagoner on September 14, 2017. Purdy told law enforcement on October 26 that Wagoner was either then in possession of a quantity of methamphetamine or shortly would be. There was already an active arrest warrant for Wagoner, so the Sheriff's Office sent officers to Wagoner's sister's mobile home roughly an hour and a half after receiving this information. There, they found Wagoner and his friend Roberta Ann Benge

smoking methamphetamine in a bedroom. The officers arrested Wagoner based on the warrant and Benge based on the presence of drug paraphernalia in the bedroom. While three or four officers remained behind to "maintain[] security in the residence," Officer Richard Dalrymple left, secured a warrant to search the home, and returned to the same mobile home. (DE67, Suppression Hr'g Tr., Page ID 400−01, 404.) The search resulted in three ounces of methamphetamine (found under the bed in the room where the two had been smoking), several sets of scales, pipes, and other materials that indicated drug trafficking.

The search warrant stated that its target was "the residence of Nathan Wagoner at 7881 Barbourville Rd., London, KY." (DE15-1, Search Warrant, Page ID 49.) It included an attachment with greater detail. The attachment described and gave detailed directions to the place to be searched:

> From the junction of KY HWY 229 and U.S. 25 in London, travel south on KY HWY 229 approximately 7.8 miles to the last lane on the right before Benge's market. Follow the one lane gravel drive to the end, approximately 1/10 mile to beige siding mobile with blue shutters home with an attached covered front porch and an attached wooden back porch sitting to the right of a white metal building.

(*Id.* at Page ID 51.)

But the search warrant in question was imperfect. The mobile home where the officers found Wagoner, where they searched and recovered the evidence against him, was not beige; it was gray. There were no blue shutters. 7881 was not the correct house number. In fact, there were multiple buildings with separate addresses on the property, including one house, a garage with an attached apartment, a single-wide mobile home, and the double-wide mobile home in question. At the top of the driveway were four mailboxes, none of which sat in front of a building or otherwise indicated the residence to which they belonged. The mailbox marked 7881 was associated with the house on the property, not the searched mobile home. Finally, Wagoner

actually lived in the apartment attached to the garage, not the mobile home. His sister, Stacy Allen, owned the mobile home but was not living there at the time of Wagoner's arrest.

At trial, Wagoner moved to suppress the evidence found during the search on the grounds that the warrant lacked sufficient particularity because it "specified a different residence than the one actually searched." (DE 12, Mot. to Suppress, Page ID 32.) The magistrate judge recommended that the motion be denied because "no reasonable probability existed that a mistaken location would be searched." (DE22, R.&R. Den. Mot. to Suppress, Page ID 75.) The district court adopted the recommendation and denied the motion, and so the drugs, scales, pipes, and other paraphernalia were submitted as evidence at trial.

Wagoner's trial began on Tuesday, April 23, 2019, with *voir dire*. The juror pool consisted of 51 jurors drawn randomly from the voter rolls of 22 surrounding counties. During *voir dire*, the court learned that a number of the potential jurors had previously served on a jury together. Two jurors had served on one criminal jury together, and a further 11 jurors had previously served together during a different criminal trial. Neither the prosecution nor Wagoner's attorney objected to the jurors who had previously served together. The judge announced the thirteen members of the final jury panel (twelve jurors and an alternate). The jury included four of the jurors who had previously served together.

At the outset of trial, Wagoner conceded guilt as to Count One for selling methamphetamine, as the controlled sale had been caught on video. However, he denied possession under Count Two, arguing that the methamphetamine found in the search of the house was not his.

At the close of the government's case, Wagoner moved for a judgment of acquittal as to Count Two on the basis of insufficiency of the evidence. Specifically, Wagoner argued that there

was not enough evidence for a jury to conclude beyond a reasonable doubt that the drugs found under the bed in the mobile home were his, and not Benge's. The prosecution disagreed, arguing that the evidence was sufficient because, among other things, it was found "in his home, under his bed[,]" and it was clear from the video recording of the controlled buy that "[h]e obviously had more" drugs than those he sold. (DE71, Trial Tr., Page ID 677−78.) The court denied Wagoner's motion, and the trial proceeded. After the defense rested, Wagoner renewed his motion, and the court again denied it.

Following the two-day trial, the jury found Wagoner guilty of both counts under 21 U.S.C. § 841(a)(1): (1) knowing and intentional distribution of a substance containing methamphetamine and (2) simple possession of 50 grams or more of methamphetamine. Wagoner timely appealed to this court.

Wagoner makes four arguments on appeal: (1) that the district court erred in denying his suppression motion, (2) that the jury selection process violated his Sixth Amendment right to a jury representing a fair cross-section of the community, (3) that he was deprived of the effective assistance of counsel, and (4) that his conviction was based on insufficient evidence. We will address each argument in turn.

II.

A.

First, Wagoner argues that the district court erred in denying his motion to suppress the evidence found in the mobile home, including three ounces of methamphetamine, scales, pipes, and other materials "indicative of drug trafficking." (*Id.* at Page ID 571.)

In reviewing a denial of a motion to suppress, "we review the district court's findings of fact under the clear-error standard and its conclusions of law de novo." *United States v. Quinney*,

583 F.3d 891, 893 (6th Cir. 2009).  Specifically, "[t]he standard of review for . . . determining whether a search warrant describe[d] the place to be searched with sufficient particularity is . . . *de novo*."  *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989).

Wagoner concedes that the warrant was based on probable cause but argues that it was so deficient in its description of the place to be searched as to violate the constitution.  The magistrate judge disagreed, recommending that the district court uphold the warrant because, despite deficiencies in the description of the address and house, it "still provided law enforcement officers with sufficient particularity to identify the property authorized to be searched."  (DE22, R. & R. Den. Mot. to Suppress, PageID 81−82.)  The district court agreed, finding that "[the magistrate judge] ably analyzed and rejected Wagoner's particularity challenge."  (DE24, Order Den. Mot. to Suppress, Page ID 88.)  We agree and affirm the district court's holding that the warrant was not deficient.

The Fourth Amendment to the United States Constitution mandates that a warrant be based on probable cause and describe the place to be searched with "particularity."  U.S. CONST. amend. IV.  The reason for this requirement is clear; the "evil that the framers of the Constitution were trying to eradicate . . . was the so-called general warrant that allowed officers to search at random."  *United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998).  However, while it is clearly preferable that a warrant be as accurate and specific as possible, this court does not require perfection.  Rather, the "test for determining whether a search warrant describes the premises to be searched with sufficient particularity" is "whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.'"  *Id.* at 465 (quoting *United States v. Gahagan*, 865 F.2d 1490, 1496 (6th Cir. 1989)).

Accordingly, under this standard "[e]ven though a warrant containing the wrong address can sometimes risk a mistaken search, such an 'error does not invalidate a search warrant if the warrant includes other specific descriptors that remove the probability that the wrong location could be searched[.]'" *United States v. Abdalla*, 972 F.3d 838, 846 (6th Cir. 2020) (quoting *United States v. Crumpton*, 824 F.3d 593, 612 (6th Cir. 2016)). Specifically, if the warrant contains errors but the description would nonetheless direct the officers to the correct location or there are additional circumstances that reduce the probability that the wrong location will be searched, then the warrant is not necessarily invalid. *See id.* (holding that a warrant listing the incorrect address was nonetheless valid because "most of the warrant unambiguously described [the correct address]"); *Durk*, 149 F.3d at 466. An example of such an additional circumstance is if the executing officer is also the affiant and had just come from the premise in question. *Durk*, 149 F.3d at 466.

Here, many descriptors in the warrant did not point to the searched mobile home. Not only did the warrant list the incorrect address, it also stated that the target was Wagoner's residence and described the target as beige with blue shutters. In fact, the mobile home was gray, did not have blue shutters, and was not Wagoner's residence.

But some specific descriptors in the warrant *did* point to the searched premises. The warrant provided accurate and detailed instructions that indisputably applied only to the searched premises, not the other structures on the property: "Follow the one lane gravel drive to the end, approximately 1/10 mile to . . . mobile . . . home with an attached covered front porch and an attached back porch sitting to the right of a white metal building." (DE15-1, Search Warrant, Page ID 51.) None of the other residential structures were at the end of the lane to the right of a metal building —only the mobile home was. So this specific descriptor only applied to the double-wide

mobile home. *See United States v. Crumpton*, 824 F.3d 593, 612–13 (6th Cir. 2016) (stating that technical "error does not invalidate a search warrant if the warrant includes other specific descriptors that remove the probability that the wrong location could be searched, especially when the warrant affiant participates in the execution of the search" and citing cases relying on location information to support that assertion). An officer who followed these directions would arrive at the correct residence. Further, the warrant's recitation of the wrong house number did not appreciably increase the chance of an incorrect search in the context of this case because the houses were not numbered. So this was not a case in which location information was of "limited usefulness." *Knott v. Sullivan*, 418 F.3d 561, 570 (6th Cir. 2005).

Additionally, the information in the warrant taken together did not accurately describe any other building on the property, minimizing the chances of searching the wrong place given he detailed location information. The other mobile home did not have blue shutters and was not located at the end of the lane. And there is no evidence that the other mobile home was beige. Although it is true that the parents' house and Wagoner's apartment were beige, neither had blue shutters. Neither were mobile homes. And neither were even close to the end of the lane; the house (located about fifty feet from the apartment) was "probably a couple football fields away." (DE67, Suppression Hr'g Tr., at Page ID 428, 423.)

Substantially decreasing the probability of a search of the wrong place, the executing officer, Agent Dalrymple, was at the mobile home immediately before he went to obtain the warrant. And officers remained at the mobile home until he returned to execute the warrant. Where, as here, there are some accurate identifiers (mobile home, location information) and the executing officer is the affiant and just came from the home in question, this court and the Eighth Circuit have upheld a search warrant. *Durk*, 149 F.3d at 466; *see also United States v. Hassell*,

427 F.2d 348, 349 (6th Cir. 1970) (upholding a warrant in part because "three officers were left at the [premise] while one went to procure the search warrant"); *United States v. Clement*, 747 F.2d 460, 461 (8th Cir. 1984) (finding no probability that an incorrect location could be searched when the officers personally knew the location to be searched); *United States v. Gitcho*, 601 F.2d 369, 372 (8th Cir. 1979), *cert. denied*, 444 U.S. 871 (1979) ("Of even greater importance is the fact that the agents executing the warrant personally knew which premises were intended to be searched, and those premises were under constant surveillance while the warrant was obtained").

The question is whether there was a "reasonable probability" that another premise might be searched under the warrant. *Durk*, 149 F.3d at 456–66. Because Dalrymple returned directly to the same mobile home he had just left, the other officers waited there for the entire time, the directions in the warrant would correctly lead an officer to the mobile home in question, and the inaccurate information taken together did not clearly point to any other structure, there is no such reasonable probability. Accordingly, we affirm the district court's denial of Wagoner's motion to suppress.

## B.

Wagoner next argues that the jury selection process violated his Sixth Amendment right to a have a jury pool consisting of a fair cross-section of the community.

The general rule is that "[w]e review *de novo* whether a defendant has been denied his right to a jury selected from a fair cross-section of the community." *United States v. Odeneal*, 517 F.3d 406, 412 (6th Cir. 2008). Wagoner failed to object to the jury composition at trial, however, and so we review his *voir dire* claim for plain error. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) ("[A]t [every phase] of a criminal proceeding, each party has a duty to object to rulings by a court in order to preserve them for appeal. . . . [a] party who neglects to make an objection,

even after being given 'an opportunity' to do so, forfeits the argument and may obtain relief on appeal only if the error is 'plain' and 'affects substantial rights.'" (quoting FED. R. CRIM P. 52(b))). To demonstrate plain error, Wagoner must show "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* at 386 (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006).

"[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). This right is most clearly violated when a jury pool consists "of only special segments of the populace or if large, distinctive groups are excluded from the pool." *Id.* at 530. To establish a prima facie violation, the defendant must first show that "the group alleged to be excluded is a 'distinctive' group in the community," second "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and third "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Wagoner's exact argument is unclear. To the extent that he argues that the members of the former criminal jury are *overrepresented*, that does not align with the typical Sixth Amendment claim, which is that some distinctive group is *underrepresented*. *See id.* (finding that women are a distinctive group whose underrepresentation on the petit jury violates the fair cross-section requirement); *Ambrose v. Booker*, 684 F.3d 638, 640 (6th Cir. 2012) (systematic exclusion of African Americans from the petit jury would constitute a Sixth Amendment violation).

To the extent that this court could sustain a claim for systematic overinclusion of a segment of the population that had previously served on juries together, it cannot sustain this one. There is

no evidence in the record of the number of people in the community who have never served on a jury together compared to the number of people who have, which would be required to fulfill the second prong of the test. *Duren*, 439 U.S. at 364. Similarly, for the third and final prong, Wagoner does not suggest that the inclusion of the eleven potential jurors who had previously served together was "due to systemic exclusion" of any group in the jury selection process. *Id.* Indeed, the petit jury was selected by "randomly draw[ing names] from the voter rolls in the" counties surrounding the courthouse where Wagoner's trial took place. (DE69, Voir Dire Tr., Page ID 449.) It is clear that there was no systematic failure to include a fair cross-section of jurors who had not previously served together, even if that could be considered a "distinct" segment of the population.

The district court did not err in permitting the eleven jurors to serve on Wagoner's petit jury. We do not, therefore, move forward with the plain error analysis to "consider whether such error was obvious or clear, affected Defendant's substantial rights, or affected the fairness, integrity, or public reputation of the proceedings." *United States v. Igboba*, 964 F.3d 501, 510 (6th Cir. 2020) (citing *United States v. Donadeo*, 910 F.3d 886, 893 (6th Cir. 2018)).

C.

Third, Wagoner brings a *Strickland* ineffective assistance of counsel claim, arguing that his counsel's performance was deficient in (1) failing to object to the presence of jurors who had served together previously during *voir dire*, (2) opening the door to prejudicial evidence through cross-examination of witnesses, (3) failing to object to other act evidence, specifically testimony about Wagoner's other drug activity, (4) failing to object to the introduction of the search warrant, and (5) questioning law enforcement officers regarding his silence, contrary to his Fifth Amendment rights. Generally, "[a] claim of ineffective assistance of counsel is a mixed question

10

of law and fact that we review de novo." *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012) (citing *Short v. United States*, 471 U.S. 686, 691 (6th Cir. 2006)). Wagoner, however, raises this issue for the first time on direct appeal, and so we review "for plain error." *United States v. Totten*, 766 F. App'x 350, 354 (6th Cir. 2019) (citing *United States v. Dedman*, 527 F.3d 577, 591 (6th Cir. 2008).

To sustain an ineffective assistance of counsel claim, the defendant must first "show that the counsel's performance was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A performance is deficient when "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial . . . whose result is reliable." *Id.*

Because this claim requires development of the record, "[t]he usual rule is that a defendant may not raise claims for ineffective assistance of counsel on direct appeal." *United States v. Sullivan*, 431 F.3d 976, 986 (6th Cir. 2005) (citing *United States v. Williams*, 176 F.3d 301, 312 (6th Cir. 1999)). Instead, the "preferable route for raising an ineffective assistance of counsel claim is in a post-conviction proceeding," which allows for development of an adequate record. *Id.* (quoting *United States v. Barrow*, 118 F.3d 482, 494 (6th Cir. 1997)). This is not always the case; "[o]n occasion this court has departed from the usual rule to address the merits of an ineffective assistance of counsel claim on direct appeal, but only when the record is adequate to address the claim." *Id.*

Wagoner argues that this is one such rare occasion. Specifically, he argues that "all of his claims are supported by the current record" and are thus appropriate for review on direct appeal.

We disagree. None of Wagoner's counsel's reasoning is apparent in the current record, and "[w]ithout an explanation from trial counsel as to why [they]" proceeded the way that they did, "we have no basis to determine whether [their] decision was the result of inadequate representation or reasonable trial strategy." *Sullivan*, 431 F.3d, at 986. This claim is more properly brought under § 2255, and so we do not reach Wagoner's ineffective assistance of counsel claims on direct review.

### D.

Finally, Wagoner argues that the district court erred in denying his motion for judgment of acquittal of Count Two, possessing 50 grams or more of methamphetamine, based on insufficiency of the evidence. We review the district court's denial of Wagoner's motion to acquit de novo. *United States v. Howard*, 947 F.3d 936, 947 (6th Cir. 2020). "When reviewing the sufficiency of the evidence, we assess whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015)). Because there is more than enough evidence to sustain Wagoner's conviction on Count Two, we affirm the district court.

Wagoner argues that there was not sufficient evidence to find that he knowingly possessed the drugs found during the search of the mobile home. Because he was with Benge, also a user of methamphetamine, at the time that the drugs were found, he argues that it cannot be determined beyond a reasonable doubt to whom the drugs belonged. We start by examining the evidence that was before the district court and the jury.

Officer Mitchell testified that he was working with a confidential source, Glenn Purdy, who informed him "that they thought they could buy ounce size quantities from Mr. Wagoner." (DE70, Trial Tr., Page ID 582.) He also testified that Purdy completed a controlled purchase of

one ounce of methamphetamine from Wagoner from the same location where the drugs in question were recovered. During this controlled purchase, Wagoner gave Purdy drugs from a bag, and Purdy saw that after the transfer "[t]here was still more [meth] in the bag." (*Id.* at Page ID 623.) A couple of weeks later, Purdy called Mitchell to say that "he had just been to [Wagoner's] residence and that he believed that Mr. Wagoner was either in possession of at that time or was receiving" more methamphetamine. (*Id.* at Page ID 597.)

Based on this tip, and because there was an active arrest warrant for Wagoner for violation of his house arrest, the officers at that time went to the mobile home to arrest him. When the officers entered to execute the warrant, they found Wagoner and Benge in the bedroom, where they observed "drug paraphernalia [ ] in plain view," and Wagoner told them that the two had just been smoking methamphetamine. (*Id.* at Page ID 598.) After securing a warrant, the officers searched and found a bag of drugs under the bed where Benge and Wagoner had been, along with scales, pipes, and plastic baggies. These drugs were, therefore, found on Wagoner's family property in the same mobile home from which Mr. Purdy had bought methamphetamine from Wagoner a couple of weeks previously. At trial, Benge testified that the drugs belonged to Wagoner and that she had not brought any drugs to the house with her. While Wagoner correctly points out that there was no fingerprint analysis done of the evidence recovered from this search, a rational jury could still have found beyond a reasonable doubt that Wagoner knowingly possessed the drugs. *See United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt" (citing *United States v. Stone*, 748 F.2d 361 (6th Cir.1984)).

13

Wagoner points to other facts in the record that he says create reasonable doubt. First, Benge told Stacie Allen, Wagoner's sister, that she would hire a lawyer for him. Second, Wagoner claims Purdy was unreliable because he was a paid informant and drug user himself. Third, Benge and Purdy had conflicting stories about whether or not they knew each other. Fourth and finally, Benge rented the mobile home for a short period of time after this incident and her subsequent incarceration. We are not persuaded. First, Benge offering to "take care" of Wagoner is not necessarily indicative of a guilty conscience; the two were in a romantic relationship. (DE71, Trial Tr., Page ID 664−65.) Second, while Wagoner's arguments as to Purdy's credibility are not implausible or irrelevant, they are insufficient to create reasonable doubt because the credibility of a witness is properly for the jury to determine. *Stone*, 487 F.2d at 512. Similarly, it was for the jury determine whether to credit Benge's testimony that she did not know Purdy. *Id.* Finally, the fact that Benge rented the mobile home after Wagoner's arrest is irrelevant; the drugs in question were found the night that Wagoner was arrested.

Because there was enough evidence for a rational trier of fact to convict Wagoner, the district court did not err in denying his motion to acquit.

III.

Because the district court did not err, we affirm Wagoner's conviction.

**CLAY, Circuit Judge, dissenting.** The majority holds that a warrant riddled with errors satisfies the Fourth Amendment's particularity requirement—even when the errors describe the defendant's home for which it is undisputed that no probable cause existed to perform a search— as long as there is some possible basis to believe that law enforcement will not search the wrong premises. The majority's holding threatens to read the particularity requirement out of the Fourth Amendment.

## BACKGROUND

The problems with this case are best illustrated by a review of the facts and circumstances surrounding the search.

At the head of a single lane gravel drive in London, Kentucky stood four mailboxes. The first building on the drive was a beige house. About 50 to 60 feet past the house was a beige garage, and Defendant Nathan Wagoner lived in an apartment attached to the garage. Both the house and the apartment had the address of 7881 Barbourville Road, and one of the mailboxes was labeled 7881. At the end of the drive was a metal garage. About 150 feet to the right of the metal garage was a gray double wide mobile home. The mobile home had a street address of 7887 Barbourville Road and was owned by Wagoner's sister, Stacy Allen. However, Allen had not lived in the trailer for some time. None of the buildings had visible street numbers.

In the fall of 2017, Glenn Purdy, a confidential source for the United States Drug Enforcement Administration ("DEA"), informed DEA Agent Brad Mitchell that he thought he could buy ounce size quantities of methamphetamine from Wagoner. Following an exchange of messages between Wagoner and Purdy, on September 14, 2017, Purdy went to the mobile home and purchased a baggie of crystal meth from Wagoner. During the controlled buy, Purdy wore a recording device, provided by the DEA, that captured the transaction.

15

A little over a month later, on October 26, 2017, Purdy informed Agent Mitchell that "Wagoner was either in possession of at that time or was receiving . . . a load or an unknown amount of methamphetamine." (Trial Tr., R.70 at PageID #597.) As there was an active warrant for Wagoner's arrest based on a violation of a sentence of home confinement that Wagoner was serving, Agent Mitchell, accompanied by various other law enforcement members, went to the mobile home to arrest Wagoner.

The arresting officers entered the mobile home and found Wagoner in the bedroom. Wagoner's romantic partner was also in the room. The officers observed drug paraphernalia in plain view in the bedroom and Wagoner informed one of the officers that they had just finished smoking methamphetamine. While other officers remained on the scene, Officer Richard Dalrymple left to apply for a warrant to search the mobile home. Based on Officer Dalrymple's affidavit, a search warrant authorizing a search of "the residence of Nathan Wagner at 7881 Barbourville Rd., London, Kentucky" was granted.[1] (Search Warrant, R.15-1, at PageID #49.) An attachment to the warrant "more particularly described" the location to be searched as:

> From the junction of KY HWY 229 and U.S. 25 in London, travel south on KY HWY 229 approximately 7.8 miles to the last lane on the right before Benge's market. Follow the one lane gravel drive to the end, approximately 1/10 mile to beige siding mobile with blue shutters home with an attached covered front porch and an attached back porch sitting to the right of a white metal building.

(Search Warrant, R.15-1, at PageID ##49–51.) However, this description contained numerous errors. The street number of the mobile home was 7887 Barbourville Road, the mobile home was not beige, it did not have blue shutters, and Wagoner did not reside there.[2]

---

[1] The search warrant misspelled Defendant's last name as "Wagner," but Wagoner has not challenged this typographical error.

[2] Although Wagoner was in the mobile home when he sold the methamphetamine to Purdy and when the officers arrived to arrest him, Wagoner has testified, and the government has not disputed, that 7881 Barbourville Road was the address listed for his house arrest, and that he told the arresting officers that the mobile home was not his residence.

When Officer Dalrymple returned, the officers executed the search warrant. During the search, the officers found a container under the bed holding methamphetamine, three sets of digital scales, three glass pipes believed to be methamphetamine pipes, and numerous plastic baggies.

For the September 14, 2017 controlled buy, Wagoner was charged with knowingly and intentionally distributing a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 1), and, for the methamphetamine found in the mobile home on October 26, 2017, with knowingly and intentionally possessing with intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (Count 2). Based on the errors in the search warrant, Wagoner filed a pretrial motion to suppress the evidence obtained during the search of the mobile home. Following an evidentiary hearing, and after acknowledging the defects in the search warrant, the assigned magistrate judge recommended that the district court deny the motion to suppress. The district court adopted the magistrate judge's recommendation.

Wagoner's jury trial began on April 23, 2019. The next day, the jury returned a verdict of guilty on both counts. This timely appeal followed.

**DISCUSSION**

The Fourth Amendment to the Constitution "was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). As ratified, the Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the

persons or things to be seized." U.S. CONST. amend. IV. "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) (citations omitted). Not all errors in a warrant, however, violate the particularity requirement. The Supreme Court has explained that "the purpose of the particularity requirement" is both to prevent "general searches" and to "assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)). Therefore, a warrant containing an error in its description will not be invalid so long as the purposes of the particularity requirement are nonetheless served.

This Court has explained that "[t]he test for determining whether a search warrant describes the premises to be searched with sufficient particularity [is] . . . whether the description is sufficient 'to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched.'" *United States v. Abdalla*, 972 F. 3d 838, 846 (6th Cir. 2020) (quoting *United States v. Pelayo-Landero*, 285 F.3d 491, 496 (6th Cir. 2002)); *see also United States v. Crumpton*, 824 F.3d 593, 612 (6th Cir. 2016) (quoting *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir. 2005)). We have also explained that a search warrant containing an incorrect address is only valid if it contains "specific descriptors that remove the probability that the wrong location could be searched." *Crumpton*, 824 F.3d at 612 (citing *United States v. Hang Le–Thy Tran*, 433 F.3d 472, 480 (6th Cir. 2006); *Pelayo-Landero*, 285 F.3d at 497).

For example, in *Abdalla*, the officer drafting the search warrant accidentally listed an address in the wrong county due to "using a previous warrant as a template and failing to erase all

vestiges of that document." 972 F.3d at 842. Although the "warrant gave detailed directions to Abdalla's property and contained unique identifiers of Abdalla's residence, such as his trailer's color, the property's layout, an American flag in front of the home, and an auto detail sign at the driveway's entrance," the defendant claimed that the warrant was defective because it did not describe his property with particularity. *Id.* However, we held that "the likelihood of a mistaken search was practically nil" because "details about a white trailer with a green porch, a black shingle roof, and a unique sign in the driveway constitute unique identifiers . . . . So even if officers arrived at 254 Carey Road, the mistaken address listed in the warrant, there was almost no chance that the property located there would at all resemble the description in the warrant." *Id*. at 846; *see also United States v. Durk*, 149 F.3d 464, 466 (6th Cir. 1998) (holding that a warrant was sufficient notwithstanding the incorrect address because of the warrant's description of an "unusual feature: a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie."); *Pelayo-Landero*, 285 F.3d at 497 (explaining that a warrant with a possibly incorrect address satisfied the particularity requirement because the directions to the trailer were accurate, there was a correct description of the trailer, and "the warrant include[d] an unusual feature of the trailer, the number 954 displayed under a window air conditioner on the right end of the trailer."); *Hang Le–Thy Tran*, 433 F.3d 472, 480 (holding that an incorrect address in a warrant was not fatal because the other descriptors, which included that the area to be searched was "a portioned off storage room in the lower level," correctly described the proper premises and removed the probability that the incorrect address would be searched).

Because the warrant used in this case to search the mobile home stated an incorrect address, it only satisfies the Fourth Amendment if it contained "specific descriptors that remove[d] the probability that the wrong location could be searched." *Crumpton*, 824 F.3d at 612. However,

although the directions to the mobile home were correct, the unique descriptors in the warrant did not describe the proper location. The mobile home was not beige. It did not have blue shutters. And Wagoner did not reside there.[3]

Even worse, two of these descriptors—the color and Wagoner's residence—matched the incorrect street address. Law enforcement arriving at the gravel drive to execute the search warrant had two options. Either they could ignore the incorrect street address, the incorrect color, the lack of blue shutters, and Wagoner's lack of residency and strictly follow the directions to the mobile home, or they could search the nearby home and apartment that had the correct street address, that was the correct color, and that was Wagoner's residence. *See Knott*, 418 F.3d at 569 (holding that a search warrant was insufficient when "virtually every descriptor of the vehicle included in the search warrant and accompanying affidavit was incorrect" and the descriptors accurately described another vehicle owned by a member of the plaintiff's family). This Catch-22—to blindly follow the precise directions to the mobile home or to follow the street address and the majority of the descriptors to the house or apartment—created a reasonable probability that the wrong location would be searched. *See id.* at 570.

The majority argues that the warrant satisfied the particularity requirement because "some specific descriptors in the warrant did point to the searched premises." Maj Op. at 6. But the problem with the warrant was that other specific descriptors pointed to Wagoner's home. To be sure, some officers would blindly follow the instructions in the warrant and ignore that the mobile home was the wrong color and lacked blue shutters. There is a reasonable probability, however, that other officers would end up searching Wagoner's home. An officer who did not ignore the address and the descriptors provided in the warrant, say, an officer using GPS technology to locate

---

[3] As all the buildings on the gravel drive had front and back porches, this descriptor did nothing to mitigate the risk that the wrong building would be searched.

the premises, would arrive at Wagoner's home and see unique descriptors matching those contained in the warrant.[4] Another officer who knew from arrest records that Wagoner's home was 7881 Barbourville Road might follow the directions in the warrant to the mobile home and, upon seeing that the mobile home was not beige and did not have blue shutters, might assume that the warrant was intended to allow a search of Wagoner's beige home. This is especially so because the warrant provided for a search of a "beige siding mobile with blue shutters home." Considering the incorrect address, the incorrect color, the lack of blue shutters, and the references to Wagoner's residence, there is a reasonable probability that an officer would assume that the word "mobile" was an inadvertent addition to the warrant.

The majority also argues that the probability of a search of the wrong place was decreased because Officer Dalrymple had been at the mobile home prior to obtaining the warrant and other officers remained at the mobile home until he returned. However, the majority misstates the significance of such evidence. This Court has only characterized such evidence as "additional circumstances" that support holding that a warrant with an incorrect address is valid in cases where, unlike here, the warrant contains correct unique descriptors of the property to be searched that remove the probability of the wrong location being searched. *See Durk*, 149 F.3d at 466; *Hang Le–Thy Tran*, 433 F.3d at 480; *Pelayo-Landero*, 285 F.3d at 497; *United States v. Bucio-Cabrales*, 635 F. App'x 324, 332 (6th Cir. 2016). For example, in *Durk*, we explained that a warrant with an incorrect address satisfied the particularity requirement because, in addition to correctly describing the house to be searched "as a single-family red brick ranch home on the north side of Fulton street,

---

[4] The majority argues "that the warrant's recitation of the wrong house number did not appreciably increase the chance of an incorrect search in the context of this case because the houses were not numbered." Maj. Op. at 7. This argument completely ignores the prevalence of GPS technology, which directs users to a specific address even if the house lacks a visible number. There is a reasonable probability that a police officer seeking the house described in the warrant would plug 7881 Barbourville Road into their GPS and would pay no attention to the turn-by-turn instructions provided in the warrant.

. . . the warrant also describe[d] a more unusual feature: a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie." 149 F.3d at 466. Only after concluding that the warrant's unique descriptors removed the possibility of searching the wrong premises did we state that "[m]oreover, additional circumstances"—including that "the executing officer . . . was also the affiant and had just come from [the] home" and that another officer remained at the home while the executing officer procured the search warrant—"make clear that the inaccuracies in the warrant here would not lead to a mistaken search of other premises." *Id.*; *see also Abdalla*, 972 F.3d at 846–47 (after holding that the unique descriptors reduced "the likelihood of a mistaken search [to] practically nil," stating that "[w]hat is more, . . . Agent Gooch's dual role as the affiant and the executing officer, although not dispositive, reduced the likelihood of a mistaken search.").

Nonetheless, the majority holds that "[w]here, as here, there are some accurate identifiers (mobile home, location information) and the executing officer is the affiant and just came from the home in question, this court and the Eighth Circuit have upheld a search warrant."[5] Maj. Op. at 8. However, "some accurate identifiers" are not enough. Every single one of our cases to uphold a warrant with an incorrect address has relied on correct unique descriptors in the warrant. When such warrants have contained correct unique descriptors, we have occasionally relied on evidence that the executing officer left the correct premises to obtain the warrant while other officers remained at the premises as "additional circumstances" supporting a determination that there was no reasonable probability that the wrong premises would be searched. In *Durk*, police arriving at the incorrect address would have undoubtedly realized there was a mistake because they would

---

[5] The majority's reliance on two Eighth Circuit cases is misplaced. Those cases are both not controlling and distinguishable. In *United States v. Gitcho*, 601 F.2d 369 (8th Cir. 1979), "[t]he address stated in the warrant [did] not exist, making the mistaken search of the wrong premises unlikely." *Id.* at 372. And in *United States v. Clement*, 747 F.2d 460 (8th Cir. 1984), the warrant correctly specified whose residence was to be searched, unlike the warrant here which incorrectly described the mobile home as Wagoner's residence. *See id.* at 461.

not have seen "a ten by fifteen foot metal storage shed, the entrance of which is secured by a plastic tie." 149 F.3d at 466. In *Pelayo-Landero*, police would not have seen "the number 954 displayed under a window air conditioner on the right end of the trailer." 285 F.3d at 497. In *Hang Le–Thy Tran*, police would not have seen "a portioned off storage room in the lower level" that they were supposed to search. 433 F.3d at 480. In *Crumpton*, police would not have seen the building and "additional sub-structure present [at] the rear of the location" that was visible in the picture with which they were provided of the proper location.[6] 824 F.3d at 613. And in *Abdalla*, police would not have seen "an American flag in front of the home, and an auto detail sign at the driveway's entrance," 972 F.3d at 842. But here, there were specific descriptors that confirmed Wagoner's home as the place to be searched. Therefore, the "additional circumstances" relied on in those cases cannot cure the warrant that described equally the mobile home and Wagoner's home. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("[W]hen it comes to the Fourth Amendment, the home is first among equals.").

Our decision in *Knott* is illustrative. In *Knott*, "virtually every descriptor of the vehicle included in the search warrant and accompanying affidavit was incorrect: the vehicle's make and model were wrong, the vehicle identification number was wrong, and the vehicle's license plate number was wrong. Indeed, the only portion of the description contained in the warrant that appears to have been correct is the statement that the vehicle was '[l]ocated at the ACSO [Athens County Sheriff's Office] garage.'" 418 F.3d at 569. "Notwithstanding the extensive errors in the

---

[6] The majority references *Crumpton* as a case in which we cited cases "relying on location information" to support the assertion that an incorrect address "does not invalidate a search warrant if the warrant includes other specific descriptors that remove the probability that the wrong location could be searched, especially when the warrant affiant participates in the execution of the search." Maj. Op. at 6–7. However, *Crumpton* cited *Hang Le–Thy Tran* and *Pelayo-Landero*—both cases in which we relied on location information *in combination* with correct specific descriptors as removing the probability that police showing up at the wrong address would search that location. No case holds that location information is enough when the specific descriptors in the warrant match the incorrect address.

23

search warrant and affidavit, the district court concluded that the Defendants' execution of the search warrant was still constitutionally permissible because Defendant Flickinger, the police officer who prepared the search warrant and affidavit, also participated in the execution of the search." *Id.* In other words, in *Knott*, there were some accurate identifiers—the warrant authorized the search of a car and provided the proper location—and the police officer who obtained the warrant participated in the search.

We reversed. Although we recognized that this Court had "previously upheld searches conducted pursuant to warrants listing incorrect addresses or property descriptions in part because the police officers involved in executing the search had also served as affiants or were otherwise familiar with the location to be searched," we explained that "the risk of misidentification created by the defective warrants in those cases was markedly less severe" because the warrants in those cases contained unique descriptors that removed the probability that the wrong location would be searched. *Id.* at 568–570. As the unique descriptors in the warrant obtained by Officer Dalrymple were incorrect (and actually identified the defendant's home for which there existed no probable cause to search), Officer Dalrymple's familiarity with the mobile home and the fact that other officers remained there while he procured the search warrant did not overcome the warrant's defects.

Although the particularity requirement is intended to constrain law enforcement from conducting general searches, the majority's conception of the requirement threatens to provide law enforcement with unlimited discretion in executing search warrants. Almost no particularity is required in a warrant, according to the majority, so long as some aspect of the warrant is correct and law enforcement appears to have a familiarity with the premises they are authorized to search. Allowing law enforcement to provide ambiguous descriptors that could allow for the search of

24

premises for which there is no probable cause would eviscerate the particularity requirement. Of course, in this case, even though the warrant described Wagoner's home, the police officers restrained themselves and only searched the mobile home. However, "the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer." *Groh*, 540 U.S. at 561 (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)).

Similarly, the particularity requirement helps to ensure that police officers do not mistakenly search areas for which there is no probable cause. Suppose Officer Dalrymple had decided to seek a search warrant for both the mobile home and Wagoner's residence based on the mistaken assumption that probable cause existed to search both premises. The judicial officer could have then issued a warrant intending to limit the scope to the mobile home. *See id.* ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request."). But based on the incorrect descriptors provided by Officer Dalrymple, it is likely that the officers would have assumed that they possessed a warrant allowing them to also search Wagoner's residence. The particularity requirement seeks to ensure that such mistakes do not happen.

Moreover, even assuming that the officers would not have relied on the incorrect descriptors in the warrant as a basis to search Wagoner's home, the many errors in the warrant meant that Wagoner was not provided with any assurance of which property would be searched and "[of] the limits of [the executing officers'] power to search." *Id.* at 561 (quoting *Chadwick*, 433 U.S. at 9). When Wagoner read the 7881 Barbourville Road address in the search warrant and saw no unique descriptors making it clear that only 7887 Barbourville Road would be searched, he had no assurance that his home would not also be searched.

"[I]n light of the profound errors contained in the search warrant and affidavit, the search of [the mobile home] cannot be upheld as the lawful execution of a valid search warrant." *Knott*, 418 F.3d at 570. A warrant containing an incorrect address and descriptors that describe a place other than the one to be lawfully searched does not satisfy the Fourth Amendment's requirement that it "particularly describ[e] the place to be searched." U.S. CONST. amend. IV. Because there was a reasonable probability that Wagoner's actual residence—the beige apartment—or the accompanying beige house could have been searched, the warrant used to search the mobile home was invalid.

There is one more issue to resolve before determining that the district court's denial of Wagoner's motion to suppress should be reversed. Wagoner argued that, if the Court determined that the warrant was invalid, the good faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984) should not apply. The government's only reference in its briefs to the good faith exception is that "[b]ecause these discrepancies are not fatal and the warrant remained valid, there is no need for this Court to address the good faith exception." (Appellee Brief at 9.) Accordingly, the argument is waived. *See United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999) (citations omitted) (holding that the government waived the argument that documents seized in violation of the Fourth Amendment should be admitted under the good faith exception to the exclusionary rule because the government failed to brief the argument); *see also Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir. 1999) (citations omitted); *Willis v. Jones*, 329 F. App'x 7, 15 (6th Cir. 2009). In any event, the Supreme Court has explained that "a warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Groh*, 540 U.S. at 565 (quoting *Leon*, 468 U.S. at 923). Considering the extent of the warrant's failure to properly

particularize the mobile home as the place to be searched, the executing officers could not have reasonably believed the warrant to be valid. Therefore, the district court's denial of Wagoner's motion to suppress should be reversed.

## CONCLUSION

For the Fourth Amendment's particularity requirement to be more than a dead letter it must provide that a warrant listing the defendant's home address as the place to be searched, and including several unique descriptors matching the defendant's home, cannot be valid when there was undisputedly no probable cause to search the defendant's home. Accordingly, I would reverse the district court's order denying Wagoner's motion to suppress the evidence found in the mobile home.[7]

---

[7] Because the district court erred in denying Wagoner's motion to suppress, there is no need to determine whether Wagoner's other claims have merit.