NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0434n.06

No. 23-1727

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Oct 30, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ZEBULON TIMOTHY NESTER, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |
| | ) | |

Before: MOORE, COLE, LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Zebulon Nester pleaded guilty to being a felon in possession of a firearm, reserving his right to appeal the district court's denial of his motion to suppress. The district court sentenced him to 150 months in prison. Nester now appeals, challenging the district court's decision on his suppression motion and his sentence. For the reasons that follow, we AFFIRM.

I.

In May 2022, a confidential informant (CI) told the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that Zebulon Nester was selling "Glock switches." Glock switches are parts, or a combination of parts, that can convert a semiautomatic Glock pistol into a fully automatic weapon. The CI also sent ATF a Snapchat video of the CI and Nester shooting pistols with Glock switches. Nester had been convicted in Michigan state court in 2014 of assault with

the intent to rob while unarmed—a felony offense. Accordingly, he was subject to the federal bar on possession of firearms by those convicted of felony offenses.

On June 8, the Newaygo County Sherriff's Office received reports of a break-in at a residence. While investigating it, they encountered Nester and his brother, Aaron Jude Capizzi. The two possessed firearms, ammunition, burglary tools, and other property stolen from the residence. Deputies arrested both men, and they were subsequently released.

Then, on June 15, ATF received a report from the CI that Nester had offered to sell the CI a revolver. The CI sent a screenshot of the relevant Snapchat conversation to ATF. The next day, ATF gave the CI $375 to purchase the revolver. Nester and the CI communicated about the purchase via text messages. They met in Nester's car in a parking lot, where the CI bought the revolver from Nester. After the exchange, the CI informed ATF that Nester had a Glock pistol attached to his waistband and had mentioned another firearm for sale.

On June 21, Nester reached out to the CI again, inviting the CI to his home to peruse and purchase his firearms. Under instructions from ATF, the CI agreed to meet Nester at his home the next day. Before the CI went to Nester's home, ATF put a recording and transmitting device on the CI's person and gave the CI $500 to purchase firearms. While the CI was in Nester's home, the device covertly video recorded the visit, and the agents also surveilled the home from outside.

The CI then met with ATF to report what happened in the residence. The CI explained that, throughout the exchange, Nester carried a Glock pistol on his person, and another person called "Capo" was present. Nester had a gun safe in his bedroom containing three firearms and at least two Glock switches. At some point, Nester and Capo took the CI out to the garage. There, the CI could observe seven or eight long guns in the attic. The CI also observed ammunition, shotgun shells, and a box with firearm parts in the garage. While in the garage, Nester shot at a

chair with two pistols, each with a silencer or suppressor attached. Nester sold the CI two firearms and a bag of ammunition.

After the CI's visit to Nester's home, ATF agents sought and acquired a search warrant for Nester's property at 3696 Blackmer Road in Ravenna. When ATF agents conducted the search, Nester's wife was on the front porch; Nester was in the main bedroom downstairs; Nester's brother, Capizzi, was in a bedroom upstairs; and Nester's wife's two children were also in the home, in an upstairs bedroom. The home search revealed fifteen guns, ammunition, switches, three silencers, a ballistic helmet, two ballistic plates, and Nester's cell phone.

Following the house search, ATF obtained a search warrant for Nester's phone, which they had seized from Nester's bedside table during the search. Searching his phone revealed sixty photos of firearms, Nester posing with firearms, firearm silencers, and apparent Glock conversion devices. The search also flagged at least two "chat logs of interest," conversations that seemingly regarded the sale of firearms.

A grand jury indicted Nester on four counts of being a felon in possession of firearms. Nester filed two motions to suppress—one for the home search, the other for the cell phone search. The district court denied both motions. Nester entered into a conditional plea agreement, in which he pleaded guilty to one felon-in-possession count and the government agreed to dismiss the others. The district court accepted the agreement and sentenced Nester to 150 months in prison.

II.

When considering the denial of a motion to suppress, we review legal decisions de novo and factual determinations for clear error. *United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021). We review a finding of probable cause and a warrant's particularity de novo. *United States*

*v. Burrell*, 114 F.4th 537, 550 (6th Cir. 2024); *United States v. Kirtdoll*, 101 F.4th 454, 456 (6th Cir. 2024).

A.

We start with Nester's motion to suppress evidence seized from his residence. Nester argues that 3696 Blackmer Road contained two separate residential units, one upstairs and one downstairs, but the warrant failed to establish probable cause to search each unit. He argues that the search warrant is therefore invalid, and that all the evidence seized should be suppressed. We disagree.

The Fourth Amendment "safeguard[s] the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (citation omitted). It permits the issuance of search warrants only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To demonstrate probable cause, a warrant applicant must show a "fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). While probable cause establishes the basis for a search, particularity tailors the search's breadth. It demands that the warrant provide "enough detail" to enable the executing officer to "ascertain and identify the place intended with reasonable effort." *Kirtdoll*, 101 F.4th at 456 (quotation marks and citation omitted). It also "cabin[s] the scope of the search to those areas and items for which there exists probable cause that a crime has been committed." *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (citation omitted).

This case "fall[s] at the confluence of the Fourth Amendment's probable cause and particularity requirements."[1] *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011). If a "structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *United States v. Crumpton*, 824 F.3d 593, 614 (6th Cir. 2016) (citation omitted). That is, the warrant must be particular enough that it does not authorize a search of units lacking probable cause. *Id.* "When a warrant is obtained for an entire structure, it is invalid if law enforcement 'had known, or should have known,' that the location was divided into separate units." *Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 85–86 (1987)). But this rule naturally does not apply if the "entire building is actually being used as a single unit." *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980) (citation omitted).

Our analysis begins with the materials in the warrant affidavit itself. Special Agent Geoffrey Yandl of ATF sought a search warrant for 3696 Blackmer Road, Ravenna, Michigan. As evidence that this was Nester's residence, Agent Yandl offered the following: (1) Nester's parole records and driver's license listed it as his home address; (2) previous police reports listed it as Nester's address; (3) Nester told the CI that it was his address; (4) Agent Yandl saw the covert recording of the CI's visit to Nester's home at the address; and (5) Agent Yandl observed the home and saw the numerals "3696" affixed to the left of the front door. Agent Yandl also provided photos of the home from different angles and photos of electronic maps denoting the property as 3696 Blackmer Road.

---

[1] Nester does not suggest that the search utterly lacked probable cause. Instead, his probable cause argument concerns the extent of the search: he argues that "the warrant failed to establish probable cause to justify the *entire* search conducted." Appellant Br. at 16. Therefore, we do not conduct an independent analysis of whether probable cause justified a search of Nester's residence in the first place.

Based on the affidavit, however, it was also conceivable (though not necessarily likely) that the residence was a multi-unit dwelling. Two photos of the home showed that its upper level had its own entrance and an exterior stairwell; one of the photos, however, showed the base of the exterior stairwell overgrown with plants or weeds. The warrant also stated that the upper level had a "living area and kitchen," information the agents had obtained through a Zillow search.

At the suppression hearing, Agent Yandl explained why he nevertheless described 3696 Blackmer Road as a single residence. To start, the CI never suggested that anyone else lived at the residence. Also, ATF agents physically observed the house and saw only one set of numerals— "3696"—marking the home. Moreover, the agents verified the single-family nature of the home by contacting the United States Postal Service (USPS), which reported that it delivered mail to only one address, 3696 Blackmer Road. Lastly, as the district court noted, the video that the CI captured while inside the residence revealed "no physical restraint" between the first and second stories of the home. R. 54 Mot. to Suppress Tr., PageID 182. Based on all this evidence, the district court did not err by concluding that the officers neither knew, nor "'should have known,' that the location was divided into separate units."[2] *Crumpton*, 824 F.3d at 614 (citation omitted); *see also Whitney*, 633 F.2d at 907–08.

---

[2] Nester insists that courts cannot look beyond a warrant's four corners to determine its validity. It is true that, "[w]here an executed warrant is later challenged by a defendant, the reviewing court, in assessing whether there was probable cause for the warrant to issue, is limited to examining only 'the information presented in the four-corners of the affidavit.'" *United States v. Crawford*, 943 F.3d 297, 305 (6th Cir. 2019) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)). But in assessing a warrant's overbreadth in similar situations, we have said that the question is whether the officers "had known, or should have known," that the premises was subdivided when obtaining the warrant. *Crumpton*, 824 F.3d at 614 (quoting *Garrison*, 480 U.S. at 85–86). And in both *Crumpton* and *Garrison* the court looked to information revealed at the suppression hearing in answering that question. *See Garrison*, 480 U.S. at 85 n.10 (relying on information revealed by officers during the suppression hearing when justifying the constitutionality of the warrant); *Crumpton*, 824 F.3d at 614 (relying on officer testimony to determine that the government, when applying for the search warrant, neither knew—nor should

Nester challenges this conclusion by pointing to *United States v. Shamaeizadeh*, 80 F.3d 1131 (6th Cir. 1996). In *Shamaeizadeh*, two individuals lived on the first floor of a one-story home, and two others lived in the basement. *Id.* at 1133. One of the first-floor residents gave police consent to search the basement, though she stated that it was a separate residence. *Id.* at 1133–34. Officers later conducted two more basement searches without permission. *Id.* at 1134. Following the third search, the police sought a search warrant for the entire home, relying on information acquired during the (unconstitutional) second and third searches to justify searching the basement. *Id.* The fourth, post-warrant search revealed incriminating material, leading to charges against the basement residents. *Id.* at 1135. The district court granted the basement residents' motion to suppress, and we affirmed. *Id.* at 1135, 1139. We reasoned that the officers had both actual and constructive notice, at the time they sought the warrant, that the residence "was divided into two apartments." *Id.* at 1138. The first-floor resident had told them so. *Id.* And the "living conditions at the time of the search"—such as the first-floor resident having only restricted access to the locked basement door—revealed that the basement was a separate unit. *Id.* at 1138–39. So the officers needed to separately establish probable cause to search the basement, which they couldn't do without relying on information gleaned from the second and third searches.

We find *Shamaeizadeh* readily distinguishable. No one suggested to the ATF agents here that the residence consisted of two separate apartments. And even if the Zillow search and exterior entrance might have given the agents some reason to suspect that 3696 Blackmer Road was a

---

have known—that the residence contained multiple apartments). Even if we limited our analysis to the affidavit, it provided adequate grounds to authorize a search of the entire home. The home had only one address affixed to it and an image of the exterior stairwell showed it overgrown with plants. Also, the affidavit revealed that Agent Yandl saw a video recording of the home's interior. These facts could have led a neutral magistrate to conclude that this either was not a multi-unit home or that Agent Yandl had reason to believe only one family was using it.

multi-unit residence, their observation of the home's interior through the CI's video recording, their personal observation of the single address—"3696"—affixed to the home, and their verification with USPS reasonably dispelled any such suspicions. Because the evidence available to the agents does not suggest that they knew or should have known prior to the search that the residence was subdivided, we find the warrant was sufficiently particular and valid.

Nester also questions the warrant's execution. According to Nester, it should have become apparent to ATF agents when they searched that there were two living units. So they should have refrained from searching the upstairs unit that he claims did not belong to him.[3]

Though a later discovery that a home contains separate residences does not invalidate a warrant, it can invalidate a search. *Garrison*, 480 U.S. at 87. If officers realize that a warrant erroneously treated several distinct units as one, they must discontinue the search, "*especially* if it is unclear which unit belongs to the subject of the warrant." *Crumpton*, 824 F.3d at 614 (emphasis added). In essence, the propriety of a search depends on "the information available as the search proceed[s]," though courts must "allow some latitude for honest mistakes that are made by officers." *Garrison*, 480 U.S. at 87.

Upon entering the home, the agents saw an open staircase leading to the second floor. At the top was a doorway. Though the door had numbers on it, it was open. The doorway had wiring for a doorbell, but no doorbell. These facts suggest a former multi-unit residence currently functioning as a single residence. And evidence that agents discovered during the search supported this view. Downstairs, they found Nester in the bedroom he shared with his wife as well as a 3D

---

[3] We question whether Nester would have Fourth Amendment "standing" to challenge the execution of a search warrant in what he claims was a separate residence that he did not inhabit. *See Byrd v. United States*, 584 U.S. 395, 410–11 (2018). But the government did not raise this issue, either here or in the district court, so we do not address it. *United States v. Noble*, 762 F.3d 509, 528 (6th Cir. 2014).

printer that belonged to his brother, Capizzi. Upstairs, they found Capizzi. They also saw that the second floor no longer had a kitchenette—only two bedrooms, a small bathroom, and an exterior door. Lastly, the agents learned from Nester's wife during the search that she was the renter or owner of the home and that her children occupied one of the two upstairs bedrooms, while Capizzi used the other. These findings would reasonably lead the agents to believe that the home was a single residence.

Our opinion in *Crumpton* is instructive. There, we considered whether the search of an apparent single-family home became invalid once agents saw its interior. 824 F.3d at 614–15. From outside, the home appeared to be a single residence. *Id.* at 614. Inside, however, it was clear that the home consisted of two parts, front and back. *Id.* Though a "small kind of hole in the wall" permitted someone to go between the living spaces, there was no "normal passageway akin to an unlocked door." *Id.* (citation omitted). Nevertheless, we concluded that the layout of the home suggested that it functioned as a single residence. *Id.* at 615. It had only one bed, located in the back area. *Id.* Yet some of the defendant's belongings were in the front area. *Id.* Because the defendant seemingly occupied both parts, we found the agents' determination that the home was a single residence reasonable. *Id.*

The agents in this case had stronger grounds for continuing their search. Just as the defendant in *Crumpton* used both areas of the home, so did Nester's family. Capizzi slept upstairs, but his 3D printer was downstairs. And Nester's wife slept downstairs, whereas her children slept upstairs. Moreover, in *Crumpton*, the court deemed it harmful to the government's case that no clear entryway existed between the front and back area of the home. 824 F.3d at 614–15. By contrast, a doorway in Nester's residence unified the first and second floors—and was open when the police entered. Thus, the facts here tilt even more in the government's favor.

When ATF agents entered Nester's residence, what they saw confirmed their belief that the home was a single unit. We therefore find their search of the second floor valid. Consequently, the district court didn't err by denying Nester's motion to suppress.

B.

Next, we consider Nester's claim that the district court should have suppressed evidence procured from his cell phone. The warrant for the cell phone search, he argues, was overbroad and lacked particularity. In his view, the warrant "authorized full, unrestricted, general rummaging" of his phone.[4] Appellant Br. at 34.

The level of specificity needed to satisfy the particularity requirement "will vary depending on the crime involved and the types of items sought." *United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011) (citation omitted). With respect to searches of technological devices, our caselaw has recognized the impracticality of imposing exacting specificity requirements. We have noted, for instance, that "[f]ederal courts . . . have rejected most particularity challenges to warrants authorizing the seizure and search of entire personal or business computers." *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (quotation marks and citation omitted). That's because "criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity." *Richards*, 659 F.3d at 538 (citation omitted); *see also id.* at 554 (Moore, J., concurring). Similar considerations inform our treatment of cell phone search warrants, since "modern cell[ ]phones may contain a litany of information" that makes them "equivalent to a personal computer." *Bass*, 785 F.3d at 1049; *see also Riley v. California*, 573 U.S. 373, 393 (2014) (noting that a

---

[4] Nester also argues that the district court should have suppressed evidence from the phone search since it was tainted fruit of the residential search. Because we find the residential search was lawful, we do not consider this argument. *See United States v. Pearce*, 531 F.3d 374, 382 n.2 (6th Cir. 2008).

"distinguishing feature[] of modern cell phones is their immense storage capacity" and describing such cell phones as "minicomputers").

In *Bass*, we considered an overbreadth challenge to a cell phone search warrant. 785 F.3d at 1049. There, the government sought to search the defendant's phone for evidence related to wire fraud, credit fraud, and identity theft charges. *Id.* The affidavit demonstrated probable cause that the phone contained such evidence, but it did not specify the evidence's format. *Id.* As a result, the warrant authorized a search of the defendant's phone "for any records of communication, indicia of use, ownership, or possession, including electronic calendars, address books, e-mails, and chat logs." *Id.* at 1050. We validated the warrant, notwithstanding its "broad scope," explaining that, when the officers applied for the warrant, they could not have known the specific location of the evidence on the phone or in what format it was stored. *Id.* Thus, based on the information available to the officers at that time, the ensuing warrant was reasonable.[5] *Id.*

Here, as Nester acknowledges, the affidavit listed the evidence the government sought in the phone. In short, it sought GPS data; any files on the phone concerning the possession, sale, or transfer of firearms or ammunition; metadata about the incriminating files; contact lists; bank records; and evidence of internet activity. The district court found that the requests for files concerning the possession, sale, or transfer of firearms or ammunition, along with the request for metadata, were "tightly tied" to the charges against Nester. R. 54 Mot. to Suppress Tr., PageID 185. It found the other requests, such as contact lists and bank records, less related to the charges.

---

[5] The defendant in *Bass* had not raised the overbreadth question below, so we noted that our review was for plain error. 785 F.3d at 1049. Our analysis, however, did not lean on the standard of review, instead concluding that "the broad scope of the warrant was reasonable under the circumstances at that time." *Id.* at 1050.

Yet the court concluded that, since the government was trying to determine "how money moved or how value moved," the warrant was "as specific as the circumstances permit[ted]." *Id.*

The district court's decision is consistent with *Bass*. In *Bass*, officials obtained a much more broadly worded warrant—one that authorized a search for, among other things, "any records of communication." 785 F.3d at 1050. Yet we found this reasonable under the circumstances. *Id.* Here, the warrant mostly sought files specifically related to the sale, purchase, or transfer of firearms or ammunition. Thus, unlike the warrant in *Bass*, the warrant for Nester's phone explicitly limited most of its search requests to records concerning the relevant crime. To be sure, it also sought less direct evidence of the charges at hand. But even that evidence—Nester's bank records, contact lists, and internet activity history—was closely tied to the conduct charged. And, as in *Bass*, those requests were as specific as possible at the time. Hence, if the warrant in *Bass* passed constitutional muster, this one does too.

Our decision in *United States v. Castro* bolsters this determination. 881 F.3d 961 (6th Cir. 2018). The warrant in *Castro* authorized a cell phone search for numerous forms of electronically stored information concerning the defendant's alleged crimes. *Id.* at 964. Despite its breadth, the warrant "[r]ead as a whole" limited the officers' search to evidence of a certain crime. *Id.* at 965. The same logic applies to the more broadly worded parts of Nester's cell phone search warrant. The affidavit's first page stated the offenses for which the government was investigating Nester— being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1), and possessing a firearm not registered in his name, in violation of 26 U.S.C. § 5861(d). This specification was a "global modifier that limited the scope of the warrant." *Id.* (quotation marks and citation omitted). The beginning of the affidavit thus reined in even the less tailored warrant provisions, making it sufficiently particular.

Nester offers a handful of counterarguments, none of which persuade us. He argues that there were no temporal limits on content the government could search. We disagree. Reading the warrant holistically, the affidavit's mention of § 922(g)(1) and § 5861(d) inherently limited the search for evidence of firearm or ammunition possession to the period following Nester's release from prison in January 2021, as any violation must have occurred after his release.[6] The warrant's scope was therefore confined to a specific time period.

Nester also points to the following language as proof that the search had no bounds: "contextual information necessary to understand other evidence also falls within the scope of the warrant." Appellant Br. at 35. This language, says Nester, "open[ed] the door to review of *all* data" on Nester's phone. Appellant Reply Br. at 23. Nester, however, takes this language out of context. This provision appeared in the affidavit's "Forensic Evidence" section. Dct. Ct. Case No. 1:22-mj-308, R. 1-1, PageID 9–10. And that section sought evidence to "establish[] how the device was used, the purpose of its use, who used it, and when." *Id.* at 9. That is, it was cabined to searching for metadata—"data about other data." *United States v. Johnson*, 93 F.4th 605, 614 (2d Cir. 2024). Reading the language in context, then, we do not find it as broad as Nester suggests. Moreover, courts have upheld similarly worded warrants for searches of electronic devices. *See, e.g.*, *id.* at 614–15 (upholding a warrant that authorized a search for "[c]ontextual information necessary to understand the evidence in th[e] attachment"). We follow suit.

Lastly, Nester argues that this case is different from others in which we sanctioned broad search warrants for electronic devices. He says that those cases, unlike his, concerned crimes that

---

[6] Nester was initially released on parole in May 2020, but he absconded from parole that summer and returned to custody in August 2020. Thus, perhaps the search could have stretched back to May 2020. Regardless, it still had a temporal limitation.

inherently involved electronic activity. *See, e.g.*, *Richards*, 659 F.3d at 541–42 (authorizing a search of an entire server for child pornography). Given the non-electronic nature of his crime, Nester suggests that we should not analyze this warrant as flexibly as we have treated other search warrants for electronic devices.

Our caselaw, however, suggests that the kind of material being searched—not the type of crime being charged—guides the particularity analysis. We have taken a flexible approach to search warrants for electronic devices based on the difficulties in sifting through electronic evidence. *See id.* at 538. We have not drawn a distinction between internet crimes and "real life" crimes. Indeed, the *Castro* defendant's crime was aggravated burglary—a crime that did not occur online. 881 F.3d at 963. Yet *Castro* still validated a warrant that had broader language than the present one. We are thus not convinced by the distinction that Nester attempts to draw.

The district court didn't err by denying Nester's motion to suppress evidence obtained from the search of his cell phone.

III.

We conclude by addressing Nester's challenge to his 150-month prison sentence—a downward variance from the Guidelines range—for substantive unreasonableness. "A [defendant's] claim that a sentence is substantively unreasonable is a claim that a sentence is too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). We review for an abuse of discretion. *Id.* A sentence within the Sentencing Guidelines is presumptively reasonable. *United States v. Fields*, 763 F.3d 443, 455 (6th Cir. 2014). So a defendant faces a "demanding" burden in attempting to show "that his below-guidelines sentence is unreasonably long." *Id.* (quotation marks and citation omitted).

Nester cannot carry this burden. The district court reasonably weighed the 18 U.S.C. § 3553(a) factors. The court found that some factors counseled in favor of granting a sentence within the recommended Guidelines range: 168–180 months' imprisonment. For instance, Nester did not simply possess firearms as a felon, but also trafficked them. What is more, Nester stole firearms from people's homes. According to the district court, this was Nester's "most serious behavior." R. 72 Sentencing Tr., PageID 405. But the court also acknowledged factors that counseled against a within-Guidelines sentence. Namely, some sentence enhancements overlapped, which the range did not "reflect." *Id.* at 404. A "fair sentence," the court said, needed to account for the overlap. *Id.* After weighing these considerations, the court imposed a 150-month sentence—an eighteen-month downward variance from the Guidelines recommendation. Nester's sentence was substantively reasonable.

Nester counters by noting that a statutory maximum of fifteen years' imprisonment for his crime went into effect six days before his arrest. Even with the downward variance, his sentence exceeds the previous ten-year statutory maximum. As a result, his punishment is now longer than those of the "worst of the worst" who were caught more than six days before him. Appellant Br. at 46. This, he states, is substantively unreasonable and the type of sentencing disparity 18 U.S.C. § 3553(a)(6) says to avoid.

We disagree. When determining Nester's sentence, the district court acknowledged the recent change in the statute's maximum penalty. But the court stated that it is "simply the new reality." R. 72 Sentencing Tr., PageID 401. It also noted that, absent the government's dismissal of three other charges, Nester would have faced far more than fifteen years in prison. Therefore, the court found the "full statutory range . . . available" for sentencing, weighed the factors, and

sentenced Nester below the Guidelines range. *Id.* We see nothing substantively unreasonable about that decision.

Nester also says that the district court put too much weight on his act of stealing firearms, which he says was "contested" and "controversial." Appellant Br. at 45. Yet Nester himself admits that, in the trial court, he "dropped [his] objections" to this fact. *Id.* So the district court was entitled to rely on it. And Nester's argument that the court put too much weight on this fact falls flat where the court sentenced him below the Guidelines range.

The district court's sentence was substantively reasonable.

\* \* \*

We AFFIRM.